## MORENO v. UNITED STATES.
### No. 48754.

United States Court of Claims.
Nov. 7, 1950.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

La Vern R. Dilweg, Washington, D. C., Robert H. McNeill and T. Bruce Fuller, Washington, D. C., on the briefs, for plaintiff.

. Paris T. Houston, Washington, D. C., H. G. Morison, Asst. Atty. Gen., for defendant.

MADDEN, Judge.

. The plaintiff sues for pay which, he claims, accrued to him as an officer in the Phillippine Scouts, a part of the Army of the United States. He is. a naturalized citizen of the United States, born in the Philippines. He served as a private or non-commissioned officer in that unit from

1924 until February 7, 1942, on which date he was made a Second Lieutenant. He was taken prisoner by the Japanese Army on April 9, 1942, and was held in prison until June 28, 1942, when he was released on parole after having signed a pledge, entitled an oath, to his captors. The text of the pledge is quoted in our finding 2. After his release on parole by the Japanese he lived with his family while recuperating from malaria and beriberi until September 1942 when he moved to another place where he lived with friends and worked at harvesting rice as soon as he was strong enough. On April 10, 1943, he went to still another place in the Philippines where he went to work as chief watchman for a corporation set up by the Japanese. There he joined a local unarmed guerrilla band which was in an inactive status. He was promoted to a position as purchaser at a buying station of the corporation and held this position until October 31, 1944. In April 1944 the guerrilla group referred to was disbanded.

About October 31, 1944, the plaintiff again joined an unarmed local guerrilla unit and was an officer in it, remaining so until he returned to American military control on January 28, 1945. The guerrilla units to which the plaintiff belonged were not authorized nor approved by the American Army. No recognized guerrilla commander requested or authorized the plaintiff to accept the employment which he had with the Japanese created corporation.

On January 28, 1945, the American Army, having recaptured the Philippines, resumed military control of its former personnel. Proof of the plaintiff's loyalty was required and furnished. This proof was satisfactory to the Army. After several conflicting determinations as to the status of the plaintiff during the period of Japanese occupation, on April 28, 1948, the Commanding General, Headquarters, Philippines Ryukyus Command, to whom had been delegated authority for final action on the status of missing persons in the Philippines, made a final determination that the plaintiff was not in a casualty status during the period from October 1, 1942 to January 1, 1945. As a consequence of that determination the plaintiff has not been paid or that period, and he sues for that pay.

The plaintiff's claim is based upon the Missing Persons Act of March 7, 1942, C. 166, 56 Stat. 143, 50 U.S.C.A.Appendix Sections 1001 through 1015. We quote sections 1002 and 1006 and the pertinent parts of section 1009.

"§ 1002. Missing, interned, or captive persons; continuance of pay and allowances

"Any person who is in active service and who is officially determined to be absent in a status of missing, missing in action, interned in a neutral country, captured by an enemy, beleaguered or besieged shall, for the period he is officially carried or determined to be in any such status, be entitled to receive or to have credited to his account the same pay and allowances to which he was entitled at the beginning of such period of absence or may become entitled thereafter, and entitlement to pay and allowances shall terminate upon the date of receipt by the department concerned of evidence that the person is dead or upon the date of death prescribed or determined under provisions of section 5 of this Act (section 1005 of this Appendix): *Provided,* That such entitlement to pay and allowances shall not terminate upon expiration of term of service during absence and in case of death during absence shall not terminate earlier than the dates herein prescribed: *Provided further,* That there shall be no entitlement to pay and allowances or any period during which such person may be officially determined absent from his post of duty without authority and he shall be indebted to the Government for any payments from amounts credited to his account for such period. Mar. 7, 1942, c. 166, § 2, 56 Stat. 144, as amended July 1, 1944, c. 371, § 2, 58 Stat. 679."

"§ 1006. Same; payment of allotments in case of captured or interned persons until death or return to jurisdiction; pay and allowances and allotments of persons continued in missing status

"When it is officially reported by the head of the department concerned that a person

missing under the conditions specified in section 2 of this Act (section 1002 of this Appendix) is alive and in the hands of an enemy or is interned in a neutral country, the payments authorized by section 3 of this Act (section 1003 of this Appendix) are, subject to the provisions of section 2 of this Act (section 1002 of this Appendix), authorized to be made for a period not to extend beyond the date of the receipt by the head of the department concerned of evidence that the missing person is dead or has returned to the controllable jurisdiction of the department concerned. When a person missing or missing in action is continued in a missing status under section 5 of this Act (section 1005 of this Appendix), such person shall continue to be entitled to have pay and allowances credited as provided in section 2 of this Act (section 1002 of this Appendix) and payments of allotments, as provided in section 3 of this Act (section 1003 of this Appendix), are authorized to be continued, increased, or initiated. Mar. 7, 1942, c. 166, § 6, 56 Stat. 145, as amended Dec. 24, 1942, c. 828, § 1, 56 Stat. 1092."

"§ 1009. Determinations by department heads or designees; conclusiveness relative to status of personnel, payments, or death

"The head of the department concerned, or such subordinate as he may designate, shall have authority to make all determinations necessary in the administration of this Act [sections 1001–1017 of this Appendix], and for the purposes of this Act [sections 1001–1017 of this Appendix] determinations so made shall be conclusive as to death or finding of death, as to any other status dealt with by this Act [sections 1001–1017 of this Appendix], and as to any essential date including that upon which evidence or information is received in such department or by the head thereof. * * * Determinations are authorized to be made by the head of the department concerned, or by such subordinate as he may designate, of entitlement of any person, under provisions of this Act, to pay and allowances, including credits and charges in his account, and all such determinations shall be conclusive * * *.

When circumstances warrant reconsideration of any determination authorized to be made by this Act [sections 1001–1017 of this Appendix] the head of the department concerned, or such subordinate as he may designate, may change or modify a previous determination. * * *"

Section 846 of Title 10, U.S.C.A., will also be considered. It provides:

"§ 846. Pay during captivity.

"Every noncommissioned officer and private of the Regular Army, and every officer, noncommissioned officer, and private of any militia or volunteer corps in the service of the United States who is captured by the enemy, shall be entitled to receive during his captivity, notwithstanding the expiration of his term of service, the same pay, subsistence, and allowance to which he may be entitled while in the actual service of the United States; but this provision shall not be construed to entitle any prisoner of war of such militia corps to any pay or compensation after the date of his parole, except the traveling expenses allowed by law."

The Government urges that the concluding clause of Section 846 of Title 10 is a bar to the plaintiff's claim. We think not. It applies only to members of a "Militia Corps" mentioned earlier in the section. The section was enacted March 30, 1814, 3 Stat. 115, R.S. Sec. 1288. If there has been in recent times, any unit of armed services which answers the description of a "Militia Corps" as that expression was used in 1814, the Philippine Scouts were, at the period here in question, not such a unit. Statutory authorization for the enlistment of natives of the Philippines in the Army of the United States is found in 10 U.S.C.A. § 321. When so enlisted they do not form a unit which could be called a Militia Corps.

The Government contends that the final determination of the Commanding General, hereinabove referred to, that the plaintiff was not in a casualty status during the period here in question, was and is conclusive, and that the question of the correctness of that determination cannot be reviewed in a court. It relies, of course,

upon Section 1009 which we have quoted. The section says that the determination of the head of the department "shall be conclusive as to * * * any * * * status dealt with by this Act * * *." It further authorizes the head of the department, or his subordinate designated for that purpose, to make determinations "of entitlement of any person, under provisions of this Act, to pay and allowances," and says that "all such determinations shall be conclusive".

█ The plaintiff urges that the statute makes the administrative determination conclusive only as to the facts, such as whether the missing person was dead, imprisoned, interned, etc. But, the plaintiff contends, if the undisputed facts show that the person in question was in a certain status, the department could not conclusively determine that he was not. This might well be so as to the first provision for conclusiveness in Section 1009. But the second one, which says that determinations as to "entitlement to pay" under the Act, are to be made by the department "and all such determinations shall be conclusive" can hardly be so read. "Entitlement" includes legal as well as factual elements, and Congress must have meant, by Section 1009 as a whole, that the troublesome questions arising under the Missing Persons Act were not to be the subject of litigation.

█ We recognize that, while the Government may withhold at will its consent to be sued, such withholding is not readily attributable to it where it has created a claim against itself. Dismuke v. United States, 297 U.S. 167, 56 S.Ct. 400, 80 L.Ed. 561. We have here, however, the "compelling language" which the Dismuke case said would be sufficient. And if we were to assume that Congress, in creating claims against the United States, never intends to subject a claimant to a departmental decision which is arbitrary and capricious, and that, therefore, even "compelling language" of conclusiveness, such as that of Section 1009, should be read as if it contained an exception allowing suit to be brought if the departmental denial of the claim was arbitrary and capricious, the plaintiff's position would not be improved. The question, whether it be factual or legal, of whether the plaintiff, being at home or at large in his home country, but on parole granted by an occupying enemy, which parole was accepted by the plaintiff either willingly, or under duress, was in the status of a person "captured by an enemy, beleaguered or besieged" as the statute provides, is difficult indeed. There is no ready answer to it, and it cannot be said that the answer which the department gave was arbitrary and capricious.

The plaintiff's petition will be dismissed. It is so ordered.

JONES, Chief Judge, and HOWELL, WHITAKER and LITTLETON, Judges, concur.