JONES, C. J., and MADDEN, WHITAKER and LITTLETON, JJ., concur.

## VICTORIO v. UNITED STATES.
### No. 49541.

United States Court of Claims.
July 15, 1952.

Prew Savoy, Washington, D. C., George A. Nugent and H. H. Martin, Washington, D. C., on the brief, for plaintiff.

Thomas O. Fleming, Washington, D. C., Holmes Baldridge, Asst. Atty. Gen., John B. Miller, Washington, D. C., on the brief, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

HOWELL, Judge.

On July 10, 1950, plaintiff's initial petition filed March 13, 1950, was dismissed on defendant's motion to dismiss. 91 F.Supp. 748. Plaintiff's claim was for reimbursement of the value of cattle allegedly furnished certain guerrilla forces known as Hunters ROTC Guerrillas of Luzon, during the Japanese occupation of the Philippine Islands from 1942 to 1945, inclusive. The ground of the court's opinion dismissing the petition was that the guerrilla band in question, although recognized and made a part of the Army of the Philippines, was not a part of the Army of the United States in spite of General MacArthur's order of January 31, 1945 recognizing Hunters ROTC Guerrillas, retroactive to May 7, 1942, as a "non-standard element of the Philippine Army serving with the armed forces of the United States," and that the requisitioning was not done by, for, or on behalf of the United States.

In reaching this conclusion, the court noted that the definition of the "Army of the United States" contained in 10 U.S.C.A. § 2 did not include, specifically or by im-

plication, the Philippine Army even while that army was in the service of the United States; that for pay, allowances, operation, maintenance and other expenses, the Philippine Army was regarded as a separate entity by Congress in appropriating the necessary funds; and that both the surrender order of General Wainwright and the later recognition order of General MacArthur in 1945, emphasized the separate identity of the Philippine Army.

At the time of our decision in this case, the court had before it only a so-called "Petition for Review and Reconsideration" prepared by a Philippine attorney who had little knowledge of the English language or of Court of Claims procedure. The only discussion of the applicable law was contained in defendant's motion for dismissal and the memoranda in support thereof. Since that time the court has allowed plaintiff's motion to substitute American counsel as attorney of record and has permitted such counsel to file an amended motion for a new trial. The parties have now furnished the court with photostatic copies of numerous pertinent official documents and with exhaustive briefs, bearing directly upon the issue of whether or not the Philippine Army and the recognized guerrilla units incorporated therein were, when called "into the service of" the Army of the United States, a part of the United States Army so as to render the United States liable on claims of persons from whom supplies were requisitioned by such guerrilla units.

The factual basis of plaintiff's claim is that plaintiff, a citizen and resident of the Republic of the Philippines, and a resident of the Philippine Islands during the period from 1941 to date, was the owner of a herd of cattle. During the years 1942 through 1945, a Philippine guerrilla band known as Hunters ROTC Guerrillas, requisitioned from plaintiff's ranch in Tanay, Rizal, some 450 head of cattle alleged to have a total value of $75,200. It is alleged that at the time of requisitions, authorized commanding officers of the guerrilla unit agreed that plaintiff would be paid for the cattle at a later date by appropriate American Army authorities. On March 24, 1948, plaintiff filed a claim for the value of his cattle with the Claims Service of Philippine-Ryukus Command (Philrycom). The claim was disallowed on April 20, 1948, for lack of evidence and a subsequent request for reconsideration was denied in 1949.

It is defendant's position that upon a proper interpretation of the various laws, proclamations and orders applicable to the facts herein, the Philippine Army, including the recognized guerrilla units, was not a part of the Army of the United States but rather served with our Army in the same manner as did allied troops in Europe under the over-all command of General Eisenhower and that accordingly the United States is not liable for the requisitioning obligations incurred by such troops.

The definition of the "Army of the United States" as found in the Act of June 3, 1916, as amended [1] is as follows:

"The Army of the United States shall consist of the Regular Army, the National Guard of the United States, the National Guard while in the service of the United States, the Officers' Reserve Corps, the Organized Reserves, and the Enlisted Reserve Corps, and shall include persons inducted into the land forces of the United States under sections 301–318 of Appendix to Title 50 [the Selective Training and Service Act of 1940, as amended]."

Defendant urges first that the guerrilla unit in question, even as a recognized part of the Philippine Army, could not and did not fit into any of the categories laid down by Congress, and that therefore any recognition of such unit or attempt to classify it as a part of the Army of the United States by official proclamation or order of the President of the United States or General MacArthur was ineffective by virtue of Article I, Section 8, of the Constitution of the United States vesting in Congress the exclusive authority to raise and support armies for the common defense of the United States. From this defendant seems to argue that Section 2(a) (12) of the Philippine Inde-

1. 39 Stat. 166; 41 Stat. 759; 48 Stat. 153; 55 Stat. 800, 10 U.S.C.A. § 2.

pendence Act of March 24, 1934, 48 Stat. 456, 48 U.S.C.A. § 1232, and the Ordinance later appended to the Philippine Constitution, could not have had the effect of making the Philippine Army a part of the Army of the United States when that Army was, as provided in such section and Constitution, called "into the service of" the armed forces of the United States.

The Philippine Independence Act of March 24, 1934, supra, is described in the preamble to the statute as an Act "to provide for the complete independence of the Philippine Islands, to provide for the adoption of a constitution and a form of government for the Philippine Islands, and for other purposes." Section 1 of that Act authorizes the Philippine Legislature to call a constitutional convention and to draft a constitution subject to certain conditions and qualifications prescribed by the United State Congress in the Act. Section 2 sets forth certain mandatory provisions to be included in the new constitution pending the final and complete withdrawal of the sovereignty of the United States. The mandatory provision contained in subsection (a) (12) is as follows:

"The Philippine Islands recognizes the right of the United States to expropriate property for public uses, to maintain military and other reservations and armed forces in the Philippines, and, upon order of the President, to call into the service of such armed forces all military forces organized by the Philippine government."

The Constitution of the Commonwealth of the Philippines was adopted February 8, 1935 and the Ordinance appended to that constitution contained a provision (12) substantially identical with the mandatory provision above quoted.

On July 26, 1941, President Roosevelt issued the following "Military Order," 6 Fed.Reg. 3825:

"Under and by virtue of the authority vested in me by the Constitution of the United States, by section 2(a) (12) of the Philippine Independence Act of March 24, 1934 (48 Stat. 457), and by the corresponding provision of the Ordinance appended to the Constitution of the Commonwealth of the Philippines, and as Commander-in-Chief of the Army and Navy of the United States, I hereby call and order into the service of the armed forces of the United States for the period of the existing emergency, and place under the command of a General Officer, United States Army, to be designated by the Secretary of War from time to time, all of the organized military forces of the Government of the Commonwealth of the Philippines: Provided, that all naval components thereof shall be placed under the command of the Commandant of the Sixteenth Naval District, United States Navy.

"This order shall take effect with relation to all units and personnel of the organized military forces of the Government of the Commonwealth of the Philippines, from and after the dates and hours, respectively, indicated in orders to be issued from time to time by the General Officer, United States Army, designated by the Secretary of War."

On the same day Douglas MacArthur was designated the Commanding General of the United States Army Forces in the Far East (USAFFE). Shortly thereafter General MacArthur issued a statement through his headquarters indicating the general plan for the integration of the organized armed forces of the Philippine Commonwealth into the service of the Army of the United States. On December 18, 1941, General MacArthur issued General Orders No. 46 providing:

"1. Pursuant to provisions of the Proclamation of the President of the United States, dated July 26, 1941, all personnel of the Philippine Army on active duty and all active units of the Philippine Army, less personnel and units already accepted for service with the United States Army Forces, are hereby called into the service of the armed forces of the United States in the Philippines, effective on the date of acceptance for the period of the existing emergency, and will be accepted for

such service of officers in the service of the United States Army Forces in the Philippines.

"2. Personnel of the Philippine Army which may hereafter be called to active duty and units thereof which may hereafter be activated are hereby called into the service of the armed forces of the United States in the Philippines, effective on the date of acceptance, and will be accepted for such service by officers in the service of the United States Army Forces in the Philippines."

Previously, on October 6, 1941, pursuant to General Orders No. 15, General MacArthur "called into the service of the armed forces of the United States in the Philippines, for the period of the existing emergency," the First Regiment, Philippine Constabulary. The Order provided for an acceptance ceremony and for assignment of the unit to the command of the Commanding General, Philippine Department.

On May 7, 1942, General Wainwright ordered the surrender of all American and Philippine Army troops in the Philippine Islands. Sometime later in that same month, an underground unit known as "Hunters ROTC Guerrillas of Luzon" was organized consisting of 193 men and officers. By the middle of 1945 the number had increased to several thousand.

On October 28, 1944, the President of the Philippines issued Executive Order 21 providing that pursuant to Emergency Powers Law, Section 22a and Section 27 of the Commonwealth Act Numbered One notwithstanding, all persons actively serving in recognized military forces in the Philippines were to be considered on active service in the Philippine Army, the date of entry into such active service being the date of joining a recognized military force; that a recognized military force was deemed to be a force under a commander appointed, designated or recognized by the Commander-in-Chief, Southwest Pacific Area. On

March 26, 1945, an order was issued by the Headquarters, Sixth Army providing for the recognition of certain guerrilla units as authorized elements of USAFFE. The order further stated that pursuant to Executive Order 21 by the Philippine President, the status of members of these units, who have served while the unit was in direct support of Sixth Army combat operations, is that of officers and enlisted men of the Philippine Army. Attached to the Order was a list of recognized guerrilla units. From time to time thereafter, additional orders were issued by Headquarters of United States Army Forces in the Far East recognizing as authorized elements of that command additional guerrilla units. Certain of these orders applied to the guerrilla unit in question and on September 3, 1947, an order was issued by the office of the Commanding General changing the recognition date of Hunters ROTC Guerrillas to May 7, 1942.

In the absence of any mention of the Philippine armed forces in the Congressional definition of the Army of the United States there would seem to be some question as to the effect in law of the mandatory provision in the Philippine Constitution and Section 2(a) (12) of the Philippine Independence Act of 1934. There is apparently no question that when the National Guards of the several states and territories (excepting the Philippines) are called into the service of the United States they become a true part of the Army of the United States and a proper requisition of private property for the use of and by a National Guard unit called into such service, would bind the United States.[2]

A clue as to how Congress regarded the "calling-into-service" of the Philippine armed forces is, we think, to be found in the Act of January 26, 1918, 40 Stat. 432, 32 U.S.C.A. § 84, which provides as follows:

"The militia and other locally created armed forces in the Philippine Islands may be called into the service of the United States, and all members thereof

---

**2.** Section 4c of Title 32 relating to the National Guard provides that the word "Territory" as used therein and in all laws relating to the land militia and the

National Guard shall apply to Hawaii, Alaska, Puerto Rico, and the Canal Zone; Act of June 3, 1916, 39 Stat. 198, 47 Stat. 158.

may be drafted into said service and organized in such manner as is or may be provided by law for calling or drafting the National Guard into said service, and shall in all respects while therein be upon the same footing with members of the National Guard so called or drafted: *Provided,* That the pay and allowances of officers and men of the Philippine Militia and other locally created armed forces in the Philippine Islands called into the service of the United States under the provisions of this act when serving in the Philippine Islands shall in no case exceed the pay and allowances for corresponding grades of Philippine Scouts."

This law was never amended or specifically repealed and remained in the United States Code until it was finally omitted in view of the granting of complete independence to the Philippine Islands by Proc. No. 2695, effective July 4, 1946, 60 Stat. 1352, 22 U.S.C.A. § 1394 note.[3] This 1918 law would seem to place the armed forces of the Philippines on the same footing as the National Guard when called into the service of the Army of the United States.

The Act of March 30, 1918, 40 Stat. 500, in part provided:

"That officers of the Philippine Scouts be, and they hereby are, made eligible to appointment as officers in the militia or other locally created armed forces in the Philippine Islands which have been or shall hereafter be drafted into the service of the United States; * * *.

"Sec. 2. That in computing period of service for any purpose officers of the Philippine Scouts shall be credited with all time served as commissioned officers in the drafted forces mentioned in section one of this Act."

On November 18, 1918, President Woodrow Wilson issued the following Proclamation, 40 Stat. 1890:

"Whereas, by an Act of Congress entitled, 'An Act to Authorize the Calling into the Service of the United States, the Militia and Other Locally Created Armed Forces in the Philippine Islands and for Other Purposes,' [40 Stat. 432, supra] approved by the President on the twenty-sixth of January, one thousand nine hundred and eighteen, it is provided that the militia and other regularly armed forces in the Philippine Islands may be called into said service and organized in such manner as is or may be provided by law for calling or drafting the National Guard into said service, and

"Whereas, by an Act of Congress entitled, 'An Act for Making Further and More Effectual Provision for the National Defense and Other Purposes,' [39 Stat. 208] approved the third day of June, one thousand nine hundred and sixteen, it is provided that, 'The National Guard, when called as such into the service of the United States shall, from the time they are required by the terms of the call to respond thereto, be subject to the laws and regulations governing the Regular Army,'

"Now, therefore, I, Woodrow Wilson, President of the United States of America, by authority of the powers conferred upon me by said Acts of Congress, do hereby call into the military service of the United States to serve therein for the period of one month, unless sooner discharged, as of and from the twentieth day of November, one thousand nine hundred and eighteen, the members of one Infantry Division of the Philippine Guard, as organized under the Tables of Organization of the United States Army, approved the third day of May, one thousand nine hundred and seventeen, as appears in Table twenty-five thereof, saving and excepting one major gener-

3. The United States Code, Title 32, from 1946 to date contains the following statement with respect to section 84, 40 Stat. 432: .
  "Section, has been omitted in view of the granting of independence to the Philippine Islands by Proc. No. 2695, eff. July 4, 1946, 11 F.R. 7517, 60 Stat. 1352, which was issued under the authority of section 1240 of Title 48, Territories and Insular Possessions, and is set out as a note thereunder."

al, one regiment of cavalry, one aero squadron, artillery and trains.

"All persons hereby called, shall, on and from the twentieth day of November, one thousand nine hundred and eighteen, be subject to the laws and regulations governing the Regular Army.

"The officers of said organizations who are called and whose offices are provided for in like organizations of the Regular Army, under Tables of Organization here before referred to, shall continue to exercise command in the grade in which they now hold commissions as officers of said Guard. * * * the non-commissioned officers of said organizations, the members of which are hereby called, shall continue as non-commissioned officers in said organizations in the Federal Service with the same relative rank as heretofore and all other enlisted men in said organizations shall continue in the grades and ratings held by them in the Guard of the Philippine Islands on the twentieth day of November * * *.

"The several organizations hereby called into the Federal Service will bear the designation which they now hold in the Guard of the Philippine Islands."

When President Wilson called into the service of the Army of the United States the armed forces of the Philippines, he did so in the manner provided and under the terms of Section 81 of Title 32 of the United States Code relating to the call or draft of the National Guard into federal service. Unless Section 2(a) (12) of the Philippine Independence Act of 1934 repeals or materially changes the purport of the Act of January 26, 1918, 40 Stat. 432, the earlier law remained in effect and President Roosevelt's action in 1941 calling the Philippine armed forces into the service of the Army of the United States would place those forces on a footing similar to that of the National Guard units called into that service. Section 15 of the Philippine Independence Act of 1934 contains the following provision respecting the effect of that Act

on other statutes of the United States or of the Philippine Legislature:

"Except as in this Act otherwise provided, the laws now or hereafter in force in the Philippine Islands shall continue in force in the Commonwealth of the Philippine Islands until altered, amended, or repealed by the Legislature of the Commonwealth of the Philippine Islands or by the Congress of the United States, and all references in such laws to the goverment or officials of the Philippines or Philippine Islands shall be construed, insofar as applicable, to refer to the government and corresponding officials respectively of the Commonwealth of the Philippine Islands. * * * Except as otherwise provided in this Act, all laws or parts of laws relating to the present government of the Philippine Islands and its administration are hereby repealed as of the date of the inauguration of the government of the Commonwealth of the Philippine Islands."

We see nothing inconsistent in the provisions of the 1918 Act and Section 2(a) (12) of the 1934 Act. The above quoted saving clause appears to be primarily for the purpose of preserving the effectiveness of acts of the Philippine Legislature and repealing only those United States laws which were in plain derogation of any new powers and rights granted to the now semi-independent territory. Nothing in the subsequent treatment of Philippine army units called into our armed service is inconsistent with that intent by Congress to reserve the right granted by the 1918 Act. The payment of Philippine units on the basis of the lower rates of pay and allowance established by Philippine law in World War II was in accordance with the proviso to that effect in the 1918 Act. The retention, insofar as possible, of the identity of the Philippine units as members of the Philippine Army was consistent with the provision in Section 81 of Title 32 of the United States Code providing that the organization of National Guard units existing at the date of their order into active federal service should be maintained intact insofar as practicable. The fact that pay and allowances

for Philippine units in our armed service in World War II were not handled through United States Army Disbursing officers, and that payment of claims for supplies requisitioned by such units was made out of funds made available by the United States to the Philippine Government, are matters of a purely administrative nature and are not decisive of the issue in suit.

Defendant also relies on certain restrictive provisions contained in the Act of February 18, 1946, 60 Stat. 14, as amended, 38 U.S.C.A. § 38. This Act was a part of the general legislation relating to pensions, bonuses and veterans' relief and provides in pertinent part as follows:

"§ 38. Service in Philippine Army as service in armed forces of the United States; benefits conferred; rate of pension; validation of prior payments.

"Service in the organized military forces of the Government of the Commonwealth of the Philippines, while such forces were in the service of the armed forces of the United States pursuant to the military order of the President of the United States dated July 26, 1941, shall not be deemed to be or to have been service in the military or naval forces of the United States or any component thereof for the purposes of any law of the United States conferring rights, privileges, or benefits upon any person by reason of the service of such person or the service of any other person in the military or naval forces of the United States or any component thereof, except benefits under (1) sections 801–818 of this title, under contracts heretofore entered into, [National Service Life Insurance Act of 1940, as amended] and (2) laws administered by the Veterans' Administration providing for the payment of pensions on account of service-connected disability or death, and (3) sections 1001–1017 of Appendix to Title 50 [Missing Persons Act]: *Provided further,* That such pensions shall be paid at the rate of * * * : *Provided further,* That any payments heretofore made under any such law to or with respect to any member of the military forces of the Government of the Commonwealth of the Philippines who served in the service of the armed forces of the United States shall not be deemed to be invalid by reason of the circumstances that his service was not service in the military or naval forces of the United States or any component thereof within the meaning of such law."

The restrictions set forth in the above Act appear to apply to payments to individuals who were in Philippine army units in the service of the United States, or their personal representatives or heirs and not to persons having no connection with the army such as plaintiff herein. Subdivision (3) was added by an amendment to the Act on July 25, 1947, 61 Stat. 455. In a report of the House Committee on Armed Services, H. Rept. 509, 80th Cong., concerning that amendment, it was noted that prior to the enactment of the Act of February 18, 1946, Philippine Army personnel called into the service of our armed forces had been entitled to the benefits of Missing Persons Act and had had their claims paid. The report referred to the Philippine Independence Act of 1934, supra, wherein the President of the United States was authorized to call into the service of the armed forces of the United States the organized military forces of the Commonwealth and that pursuant to such act organized forces of the Philippine Commonwealth were called into our armed services by Presidential Executive Order and served therein. The report stated in part as follows:

"Before this legislation can be given favorable consideration, the intent of Congress in inserting the restrictive language hereinbefore quoted in Public Law 301 [Act of February 18, 1946] must be construed. The hearings conducted by the Appropriations Committee in the Seventy-ninth Congress, during its consideration of Public Law 301, disclose that the discussion on this matter was off the record. As a consequence it has been necessary to rely upon the memory of members of that committee who are still Members of Congress. In its discussion of this

matter the question of extending the GI bill of rights, terminal leave, hospitalization, mustering-out pay, and other veterans' benefits which American soldiers received, were under consideration by the Appropriations Committee. From the best information now available it seems reasonably certain that the insertion of the restrictive language on Philippine Army Forces was made for the purpose of excluding such personnel from the above-mentioned veterans' rights and it was not intended that the Filipino Army personnel be excluded from the rights, benefits, and privileges of the Missing Persons Act. It seems reasonably certain that the restrictive wording was inadvertent and did not express the full intent of Congress.

\*　　\*　　\*　　\*　　\*　　\*

"In favorably considering this proposed legislation, it is the intent of the committee that the enactment of this bill will be a final determination of all rights and claims which Filipino Army personnel or their survivors may have against the United States Government by virtue of their having served 'in the service of the armed forces of the United States.'"

Prior to the passage of the above Act, as amended, the Attorney General of the United States had issued opinions to the effect that personnel of the organized military forces of the Commonwealth of the Philippines called and ordered into the armed forces of the United States pursuant to Section 2(a) (12) of the Act of 1934 and the President's Military Order of July 26, 1941, were in active service in the land and naval forces of the United States and were entitled to benefits under the National Service Life Insurance Act, 38 U.S.C.A. § 801 et seq.,[4] and the Missing Persons Act, 50 U.S.C.A.Appendix, § 1001 et seq.[5]

Regardless of from what fund or appropriation Congress made available money to pay the pay and allowances of Philippine army units called into the service of our army, and whether the funds were disbursed by Philippine finance officers who had been called with their units into our service, or by United States Army officers, Philippine organized forces were required, upon call of our President, to serve in our armed forces and they were paid and supplied out of funds appropriated therefor by our Congress. Such retention of their identity as they were permitted did not exempt them from such service, any more than did their national pride or state of semi-independence.

From all of the above, it appears to us that pursuant to Executive Order 21 of President Osmena, supra, and the additional orders issued by USAFFE headquarters, *recognized* guerrilla forces in the Philippines were considered to be on active duty in the Philippine Army, which Army had been called into the service of the Army of the United States pursuant to the Military Order of President Roosevelt, supra, and thus, that any requisitions made by Philippine guerrilla units in the service of the Army of the United States were for and on behalf of the United States and constitute an obligation of our Government. It further appears that the calling into the service of our forces of the Philippine units was in complete accord with the provisions of the 1918 Act and the 1934 Act. We know of no reason to question the validity of the order of our Army Headquarters, Sixth Army, recognizing the guerrilla unit in question retroactive to May 7, 1942, and accordingly any requisitions by that unit of plaintiff's property during the period of such recognition and service in our armed forces is the basis for a claim against the United States.

Plaintiff's amended motion for a new trial is allowed, the decision of July 10, 1950 is vacated and withdrawn, and plaintiff is granted permission to file an amended petition.

It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER, and LITTLETON, Judges, concur.

---

4. 40 Op.A.G. 185 (April 27, 1942).

5. 40 Op.A.G. 281 (August 5, 1943).