**Eleuterio LOGRONIO**

v.

**The UNITED STATES.**

**No. 354–54.**

United States Court of Claims.

July 12, 1955.

Elfren R. Sarte, Manila, Philippines, for plaintiff.

Alfred H. O. Boudreau, Jr., Washington, D. C., with whom was Warren E.

Burger, Asst. Atty. Gen., for defendant. Walter Kiechel, Jr., Washington, D. C., was on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

WHITAKER, Judge.

Plaintiff's claim is for pay he claims is due him as an officer in the Philippine Army. His claim covers three periods: (1) from December 18, 1941 to April 8, 1942; (2) from April 8, 1942 to September 9, 1943; and (3) from September 9, 1943 to March 31, 1945. Except for the second period, he has been paid by the Army of the Philippines under the Missing Persons Act of the Congress of the United States, Act of March 7, 1942, 56 Stat. 143, as amended, section 1001 et seq., Title 50 U.S.C.A.Appendix. His complaint is that he was given the pay of a sergeant, whereas he alleges he was a first lieutenant from December 18, 1941 to March 31, 1945, and he sues for the difference in pay and allowances.

For the second period, from April 8, 1942 to September 9, 1943, he was found to be in a "no casualty status," and, therefore, not entitled to any benefits under the Missing Persons Act for this period. He sues for his full pay and allowances for this period.

It appears that plaintiff was a member of the Philippine Army, but presumably his suit is against the United States and not the Philippines, although his petition does not so state. He prays for judgment "ordering the payment" of the amounts he claims, but he does not state against whom he desires judgment. We shall assume, however, he is asking judgment against the United States.

Although a member of the Philippine Army, plaintiff is entitled to claim the benefits of the Missing Persons Act passed by the Congress of the United States, supra. The Appropriation Act of February 18, 1946, 60 Stat. 6, 14, 38 U.S.C.A. § 38 appropriated $200,000,000 for the Army of the Philippines, but with the following provisos:

"Army of the Philippines, $200,-000,000: *Provided,* That service in the organized military forces of the Government of the Commonwealth of the Philippines, while such forces were in the service of the armed forces of the United States pursuant to the military order of the President of the United States dated July 26, 1941, shall not be deemed to be or to have been service in the military or naval forces of the United States or any component thereof for the purposes of any law of the United States conferring rights, privileges, or benefits upon any person by reason of the service of such person or the service of any other person in the military or naval forces of the United States or any component thereof, except benefits under (1) the National Service Life Insurance Act of 1940, as amended, under contracts heretofore entered into, and (2) laws administered by the Veterans' Administration providing for the payment of pensions on account of service-connected disability or death: *Provided further,* That such pensions shall be paid at the rate of one Philippine peso for each dollar authorized to be paid under the laws providing for such pensions: *Provided further,* That any payments heretofore made under any such law to or with respect to any member of the military forces of the Government of the Commonwealth of the Philippines who served in the service of the armed forces of the United States shall not be deemed to be invalid by reason of the circumstances that his service was not service in the military or naval forces of the United States or any component thereof within the meaning of such law."

On July 25, 1947, the foregoing Act was amended, 61 Stat. 455, by adding the following at the conclusion thereof: "and (3) the Missing Persons Act, approved March 7, 1942 (56 Stat. 143), as amended."

However, plaintiff is not entitled to recover under the Missing Persons Act, as amended, supra, if for no other reason, because section 9 thereof, sec. 1009 of Title 50 App. U.S.C.A. provides: "The head of the department concerned, or such subordinate as he may designate, shall have authority to make all determinations necessary in the administration of this Act, and for the purposes of this Act determinations so made shall be conclusive as to death or finding of death, as to any other status dealt with by this Act, and as to * * *." Then later the section provides again: "Determinations are authorized to be made by the head of the department concerned, or by such subordinate as he may designate, of entitlement of any person, under provisions of this Act, to pay and allowances, including credits and charges in his account, and all such determinations shall be conclusive * * *."

 The determination has been made by the authorized representative of the head of the department concerned, and we plainly have no jurisdiction to alter it. Moreno v. United States, 93 F.Supp. 607, 118 Ct.Cl. 30, certiorari denied 342 U.S. 814, 72 S.Ct. 29, 96 L.Ed. 616.

 Plaintiff's claim for pay and allowances while he was a member of a guerrilla unit stands on an entirely different basis. Plaintiff's petition does not allege that the unit of which he was a member had been recognized by the Commander in Chief, Southwest Pacific Area, as required by the order of Mr. Osmena, President of the Commonwealth of the Philippines, hereafter quoted in part; but even if his unit had been so recognized, we are of opinion that the members thereof have no claim against the United States for pay and allowances. Recognized or not, they never became members of the Army of the United States, and are not entitled to the pay and allowances of such members, nor were they authorized to bind the United States in any respect. Upon recognition by the Commander in Chief, Southwest

Pacific Area, they did become members of the Philippine Army, pursuant to Executive Order No. 21, issued by Mr. Osmena, President of the Commonwealth of the Philippines, on October 28, 1944; but the Philippine Army never became a part of the Army of the United States.

We so held in our first opinion in the case of Victorio v. United States, Ct.Cl., 91 F.Supp. 748. On a motion for a rehearing, we concluded, mainly because of the provisions of the Act of January 26, 1918, 40 Stat. 432, 32 U.S.C.A. § 84, that the Philippine Army did become a part of the Army of the United States, including members of recognized guerrilla units. 106 F.Supp. 182, 122 Ct.Cl. 708. However, we have reexamined the question and now conclude that the Act of January 26, 1918, had no application to the conditions existing in 1941, that the call of the Philippine Army "into the service of the armed forces of the United States" by President Roosevelt on July 26, 1941, did not give to the members of the Philippine Army the status of members of the Army of the United States.

We think we erred in our opinion on motion for a rehearing in the Victorio case, supra, decided July 15, 1952, and that decision is overruled.

The Act of January 26, 1918, was passed when the Philippines were a territorial possession of the United States, acquired by it from Spain under the Treaty of 1898, 30 Stat. 1754. The chief executive officer of the Philippines was a Governor General appointed by the President of the United States, and confirmed by the United States Senate. Its Supreme Court was appointed by the President of the United States, and confirmed by the United States Senate. It had its own Legislature, but this Legislature could pass no law in conflict with the Constitution of the United States nor with any Act of Congress. It was, therefore, entirely logical at that time for Congress to enact, as it did in the Act of January 26, 1918, supra, that all members of the militia "and other local-

ly created armed forces in the Philippine Islands" * * * "may be drafted into * * * [the service of the United States] and organized in such manner as is or may be provided by law for calling or drafting the National Guard [of the States] into said service, and shall in all respects while therein be upon the same footing with members of the National Guard so called or drafted."

However, the situation was entirely different when President Roosevelt on July 26, 1941, called the Philippine Army "into the service of the armed forces of the United States." In the meantime the Congress of the United States had passed the Philippine Independence Act on March 24, 1934, 48 Stat. 456, providing for "the complete independence of the Philippine Islands," to become completely effective within a period of ten years. Under that Act the Philippine Legislature was authorized to provide for the election of delegates to a constitutional convention to meet not later than October 1, 1934, "to formulate and draft a constitution for the government of the Commonwealth of the Philippine Islands * * * which shall exercise jurisdiction over all the territory ceded to the United States by the treaty of peace concluded between the United States and Spain on the 10th day of December 1898."

This right to formulate a constitution was, however, subject to certain conditions set out in the Act, "pending the final and complete withdrawal of the sovereignty of the United States over the Philippine Islands." Among these conditions were that all citizens of the Philippine Islands "shall owe allegiance to the United States," that the officers "of the government of the Commonwealth of the Philippine Islands" shall recognize and accept the "supreme authority of and will maintain true faith and allegience to the United States," the foreign affairs of the Islands were to be under the direct supervision and control of the United States, the decisions of the courts of the Commonwealth of the Phil-

ippines were subject to review by the Supreme Court of the United States, and the United States reserved "the right to intervene for the preservation of the government of the Commonwealth of the Philippine Islands and for the maintenance of the government as provided in the constitution thereof," etc.

Of particular pertinence to the question at issue in this case is the following condition, which we quote:

"The Philippine Islands recognizes the right of the United States * * * to maintain military and other reservations and armed forces in the Philippines, and, upon order of the President, to call into the service of such armed forces all military forces organized by the Philippine government."

Section 4 of the Act provided for the submission of the Constitution "to the people of the Philippine Islands for their ratification or rejection." It was further provided:

"If a majority of the votes cast shall be for the constitution, such vote shall be deemed an expression of the will of the people of the Philippine Islands in favor of Philippine independence, and the Governor General shall, within thirty days after receipt of the certification from the Philippine Legislature, issue a proclamation for the election of officers of the government of the Commonwealth of the Philippine Islands provided for in the constitution."

It was further provided that after the election of the officers provided for in the Constitution, and the proclamation of the President to that effect, "the existing Philippine government shall terminate and the new government shall enter upon its rights, privileges, powers, and duties, as provided under the constitution."

Section 6 dealt with "Relations with the United States Pending Complete Independence." Subsection (a) thereof provided for an import duty on sugar coming into the United States at the

same rate as applied to sugar "imported from foreign countries." The same was true of coconut oil, and yarn, twine, cord, cordage, rope and cable. These import duties, however, were to be levied only when the importation exceeded certain stated quantities of the articles named. On exportations from the Philippines of articles below the limits set out, the Philippines were to impose an export tax, which was graduated over the ten-year period before the independence of the Islands became complete. The export taxes so levied by the Philippines were to be applied to the bonded indebtedness of the Philippine Islands, its provinces and municipalities.

There were other restrictions imposed during the transition period from a territorial possession to an independent country, but no longer was the Governor General, appointed by the President of the United States, the chief executive officer of the Islands, nor was the Supreme Court of the Islands appointed by the President of the United States. Instead of the Governor General, the President was authorized to appoint a High Commissioner to the Commonwealth of the Philippine Islands, who was authorized to represent the President of the United States in the Philippine Islands and was given the right of access to all records of the Government, and was entitled to such information as he should request, but he exercised no executive power.

Under the Constitution, the Commonwealth of the Philippine Islands was forthwith authorized to elect a President, and a Vice President, and a Legislature, and it was authorized to provide for a Resident Commissioner to the United States, to represent it in this country.

Section 8 provided that after the acceptance by the Philippine Legislature of the Philippine Independence Act of March 24, 1934, that thereafter citizens of the Philippine Islands should be considered aliens for the purposes of the United States immigration acts, and it was provided that "for such purposes the Philippine Islands shall be considered as a separate country and shall have for each fiscal year a quota of fifty."

Section 10 provided:

"On the 4th day of July immediately following the expiration of a period of ten years from the date of the inauguration of the new government under the constitution provided for in this Act the President of the United States shall by proclamation withdraw and surrender all right of possession, supervision, jurisdiction, control, or sovereignty then existing and exercised by the United States in and over the territory and people of the Philippine Islands, including all military and other reservations of the Government of the United States in the Philippines * * * and, on behalf of the United States, shall recognize the independence of the Philippine Islands as a separate and self-governing nation and acknowledge the authority and control over the same of the government instituted by the people thereof, under the constitution then in force."

We have by no means quoted the Act in full, but only so much thereof as to indicate the markedly different status of the Philippine Islands on the date President Roosevelt called the Philippine Army into the service of the United States and its status at the time of the passage of the Act of January 26, 1918, supra.

On the date of the issuance of President Roosevelt's order, the independence of the Philippine Islands was not complete, but it was well under way, and in many respects it was in the status of a country foreign to the United States.

The Act of January 26, 1918, provided for the drafting of the members of the Philippine militia into the Army of the United States; the Philippine Independence Act of 1934, on the other hand, au-

thorized the President to call the Philippine Army "into the service of the armed forces of the United States." This was not an authorization to make the Philippine Army a part of the Army of the United States; it was authorization to call them into the service of the armed forces of the United States, but as a separate unit. The Philippine Army never lost its identity. The Philippine Independence Act, unlike the Act of January 26, 1918, did not provide for the drafting into the Army of the United States of the members of the Philippine Army. It provided for the calling of the whole Army into the service of the armed forces of the United States, which is plainly different from drafting its members into the Army of the United States. The Philippine Army retained its identity, and never did become a part of the Army of the United States.

The Constitution of the Commonwealth of the Philippine Islands provided:

"The President [of the Commonwealth] shall be Commander in Chief of all armed forces of the Philippines and, whenever it becomes necessary, he may call out armed forces to prevent or suppress violence, invasion, insurrection, or rebellion. * * *1"

On November 14, 1935, the President of the Philippines by executive order assumed command of all the armed forces of the Philippines. Under Commonwealth Act No. 1, passed on December 21, 1935, it was provided in section 22:

"* * * * * *

"(a) All commissioned officers in the Army shall be citizens of the Philippines * * *. Commissioned grades authorized in the Army of the Philippines shall include third lieutenant * * *.

"(b) * * * All appointments and promotions [of officers] shall be made by the President * * *."

Congress clearly intended that the Philippine Army should retain its identity and that it should not become a part of the Army of the United States. On December 17, 1941, about four months after the President called the Philippine Army, Congress passed a Supplemental National Defense Appropriation Act, 55 Stat. 810, "for the national defense." Section 101 provided for various appropriations for military activities of the War Department, including, among other things, a sum for "expediting production," for a "contingent fund, Chief of Staff," for "military intelligence activities", for "welfare of enlisted men," for "pay of the Army," for "travel of the Army," etc. After making various and sundry appropriations for the Army of the United States, it then made an appropriation under the heading of "Army of the Philippines." This provided at page 813:

"For all expenses necessary for the mobilization, operation, and maintenance of the Army of the Philippines, including expenses connected with calling into the service of the armed forces of the United States the organized military forces of the Government of the Commonwealth of the Philippines, and expenditures incident to pay, allowances, operation, maintenance, and other activities of units and personnel of said organized military forces, and for the emergent mobilization and training of such forces, may be made without regard to the provisions of law regulating the ex-

---

1. The Ordinance appended to the Constitution provided, however, in section 1:
"Notwithstanding the provisions of the foregoing Constitution, pending the final and complete withdrawal of the sovereignty of the United States over the Philippines.
* * * * * .

"(12) The Philippines recognizes the right of the United States * * * upon order of the President of the United States, to call into the service of such armed forces all military forces organized by the Government of the Commonwealth of the Philippines."

penditure of or accounting for funds of the United States but shall be expended and accounted for in a manner prescribed by the President of the United States, $269,000,000, to remain available until June 30, 1943, *which shall be available for payment to the Government of the Commonwealth of the Philippines* upon its written request, either in advance of or in reimbursement for all or any part of the estimated or actual cost, as authorized by the Commanding General, United States Army Forces in the Far East, of necessary expenses for the purposes aforesaid, *except that none of such moneys shall be available for the pay and allowances of personnel of said organized military forces of the Government of the Commonwealth of the Philippines, when serving in the Philippine Islands, in excess of the pay and allowances authorized by Philippine law, executive orders, and regulations which were in effect November 1, 1941* * * *.*" [Italics ours.]

Prior thereto the Legislature of the Commonwealth of the Philippines had appropriated $17,830,272.50 for the Philippine Army.

It seems to us, therefore, that the order of President Roosevelt of July 26, 1941, calling the Philippine Army into the service of the United States, was an order calling it as a separate unit, and that while in the service of the armed forces of the United States it maintained its separate identity, and did not become a part of the Army of the United States. Pertinent portions of the Order are quoted in the footnote below.[2]

2. * * * "I hereby call and order into the service of the armed forces of the United States for the period of the existing emergency, and place under the command of a General officer, United States Army, to be designated by the Secretary of War from time to time, all the organized military forces of the Commonwealth of the Philippines. * * *.

This Order recited that it was issued pursuant to section 2(a) (12) of the Philippine Independence Act of March 24, 1934, supra; it did not recite that it was issued pursuant to the Act of January 26, 1918, supra.

On July 26, 1941, General Douglas MacArthur was designated the Commanding General of the United States Army Forces in the Far East. Shortly after assuming command, he issued the following statement:

"The general plan for the integration of all the armed forces in the Philippines has been formulated by General MacArthur. It envisions a progressive incorporation of the reserve divisions of the Philippine Army into the service of the United States. It comprehends eventually all elements of the Philippine Army, but until an actual outbreak of hostilities will not include these echelons which are engaged in the normal yearly training activities. * * *

"* * * All Philippine elements which come under American control will maintain their national integrity. They will retain their own uniforms, their own scale of pay, their own promotion list, their own ration, and their own code of military law. Their training, however, will be under the immediate direction of the officers of the American Army. On muster into the American service they will be paid and supplied from American sources. * * * [Emphasis added.]"

In pursuance of the appropriation for the Army of the Philippines, President Roosevelt on January 3, 1942, issued Ex-

"This order shall take effect with relation to all units and personnel of the organized military forces of the Government of the Commonwealth of the Philippines, from and after the dates and hours, respectively indicated in orders to be issued from time to time by the General officer, United States Army, designated by the Secretary of War."

ecutive Order 9011, 7 Fed.Reg. 145, which provided in part:

"* * * the following regulations governing the manner of expending and accounting for funds appropriated for the Army of the Philippines:

"Disbursements Made by Disbursing Officers of the Army of the United States

"1 * * * (b). Advances or reimbursements made to the Government of the Commonwealth of the Philippines by disbursing officers of the Army of the United States, as authorized by the Commanding General, United States Army Forces in the Far East, for necessary expenses authorized by the act of December 17, 1941, *will be accounted for on vouchers evidencing the amounts advanced to or paid as reimbursement to the Government of the Commonwealth of the Philippines, but such vouchers need not be supported by vouchers paid by disbursing officers of the Army of the Philippines.*

"Disbursements Made by Disbursing Officers of the Army of the Philippines

"2 (a). Necessary expenditures from funds in the Philippine Treasury for the purposes authorized by the act of December 17, 1941, *will be made by disbursing officers of the Army of the Philippines* on the approval or authority of the Commanding General, United States Army Forces in the Far East, and for such purposes as he may deem proper, *and his determination thereon shall be final and conclusive upon the accounting officers of the Philippine Government,* * * *." [Italics ours.]

Thus it is seen that the money appropriated for the Philippine Army was paid to the Commonwealth of the Philippines and was disbursed by it. Had the members of the Philippine Army become members of the armed forces of the United States, they would have been paid of course by the finance officers of the United States Army.

Furthermore, attention is called to the fact that the Act provided:

"* * * none of such moneys shall be available for the pay and allowances of personnel * * * in excess of the pay and allowances authorized by Philippine law, executive orders, and regulations which were in effect November 1, 1941 * * *."

If the members of the Philippine Army had been drafted into the Army of the United States, they would have been entitled to the same pay as other members of the Army of the United States.

As further evidence of the fact that Congress, by the passage of the Philippine Independence Act of 1934, supra, did not intend that the members of the Philippine Army should become members of the Army of the United States, the Appropriation Act "for the Military Establishment" 56 Stat. 611, 628, for the following year again made a separate appropriation for the Army of the Philippines, and again it provided that the amount appropriated "shall be available for payment to the Government of the Commonwealth of the Philippines upon its written request * * *." The appropriation for the next fiscal year, 57 Stat. 347, 365, was couched in the same language, but it only appropriated the sum of $100, the Philippine Army having been surrendered to the Japanese. The appropriation for the next fiscal year, 58 Stat. 573, 591, contained the same provisions, and it also appropriated only $100. The appropriation for the next fiscal year was the same, and it also was for the sum of $100, 59 Stat. 384, 401. However, on February 18, 1946, 60 Stat. 6, 14, the appropriation act carried an appropriation of $200,000,000 for the "Army of the Philippines," and this Act recited expressly:

*"Provided,* That service in the organized military forces of the Government of the Commonwealth of the Philippines, while such forces were in the service of the armed forces of the United States pursuant to the military order of the President of the United States dated July 26, 1941, *shall not be deemed to be or to have been service in the military or naval forces of the United States or any component thereof for the purposes of any law of the United States conferring rights, privileges, or benefits upon any person by reason of the service of such person or the service of any other person in the military or naval forces of the United States or any component thereof,* except benefits under * * *."* [Italics ours.]

This Appropriation Act contained the further proviso:

"That any payments heretofore made under any such law to or with respect to any member of the military forces of the Government of the Commonwealth of the Philippines who served in the service of the armed forces of the United States shall not be deemed to be invalid *by reason of the circumstances that his service was not service in the military or naval forces of the United States or any component thereof within the meaning of such law."* [Italics ours.]

It follows from this that it was only the Commonwealth of the Philippines that was liable for the pay and allowances of the soldiers in the Philippine Army, and that the United States is not liable therefor.

Lastly, 10 U.S.C. § 2,[3] thus defines the Army of the United States:

"The Army of the United States shall consist of the Regular Army, the National Guard of the United States, the National Guard while in the service of the United States, the

Officers' Reserve Corps, the Organized Reserves, and the Enlisted Reserve Corps, and shall include persons inducted into the land forces of the United States under sections 301–318 of Appendix to Title 50 [the Selective Service Act]."

Plainly the Philippine Army does not come within this definition.

The decision of the Comptroller General in 22 C.G. 987, 989, is in accord with the view we have expressed.

Now, plaintiff alleges that he was a member of a guerrilla band in the Philippines. The members of these bands, whether the bands were recognized or not, had no greater rights than the members of the Philippine Army.

On October 28, 1944, upon his return to the Philippines, Mr. Osmena, President of the Commonwealth of the Philippines, issued the following order (No. 21):

"1. All persons, of any nationality or citizenship, who are actively serving in recognized military forces in the Philippines, are hereby considered to be on active service in the Philippine Army.

\* \* \* \* \*

"4. The date of entry into active service in the Philippine Army will be that of joining a recognized military force.

\* \* \* \* \*

"6. A recognized military force, as used herein, is defined as a force under a commander who has been appointed, designated or recognized by the Commander in Chief Southwest Pacific Area."

Under this order members of recognized guerrilla units became members of the Philippine Army, but they no more became members of the United States Army than any other member of the Philippine Army. The orders issued by General MacArthur and by other Commanders of the United States Forces were careful to recite that their status

3. Now 10 U.S.C.A. § 1b.

**404**

was that of members of the Philippine Army. For instance, General Mac-Arthur's original order relative to the recognition of guerrilla units contained the following:

"* * * the status of members of these units * * * is that of officers and enlisted men of the Philippine Army."

All other orders of recognition contained similar recitals.

Recognition, therefore, only gave to the members of these units such rights as belonged to members of the Philippine Army.

We must, therefore, conclude that we erred in holding in our opinion on motion for a new trial in the Victorio case, supra, that:

"From all of the above, it appears to us that pursuant to Executive Order 21 of President Osmena, supra, and the additional orders issued by USAFFE headquarters, *recognized* guerrilla forces in the Philippines were considered to be on active duty in the Philippine Army, which Army had been called into the service of the Army of the United States pursuant to the Military Order of President Roosevelt, supra, and thus, that any requisitions made by Philippine guerrilla units in the service of the Army of the United States were for and on behalf of the United States and constitute an obligation of our Government. It further appears that the calling into the service of our forces of the Philippine units was in complete accord with the provisions of the 1918 Act and the 1934 Act. We know of no reason to question the validity of the order of our Army Headquarters, Sixth Army, recognizing the guerrilla unit in question retroactive to May 7, 1942, and accordingly any requisitions by that unit of plaintiff's property during the period of such recognition and service in our armed forces is the basis for a claim against the United States." [106 F.Supp. 190.]

That decision is now overruled.

Since plaintiff in this case was, at most, a member of the Philippine Army and was not a member of the United States Army, his right of action, if any, is against the Commonwealth of the Philippines, and not against the United States.

Defendant's motion is granted, and plaintiff's petition is accordingly dismissed.

JONES, C. J. and LARAMORE and LITTLETON, JJ., concur.

MADDEN, Judge (concurring in the result).

The plaintiff's claim is barred in whole by the Statute of Limitations, and, in addition, is barred in part by the finality provisions of the Missing Persons Act. But instead of deciding this simple case on those simple grounds, the case is made the vehicle for overruling our former decision in the case of Victorio v. United States, 106 F.Supp. 182, 122 Ct.Cl. 708. That decision was arrived at unanimously, after normal deliberation. We have not been asked to overrule it. I think that decision was right and I cannot concur in the part of the instant opinion which overrules it.

The court is in error, I think, in saying that our conclusion in the Victorio case was reached "mainly because of the provisions of the Act of January 26, 1918, 40 Stat. 432, 32 U.S.C.A. § 84." A reading of the opinion will show that it first treated of the right, reserved in subsection 2(a) (12) of the Philippine Independence Act of March 24, 1934, authorizing the President to call into our armed forces all military forces of the Philippine Government; then of the President's call pursuant to the Act; then of the actions of General MacArthur pursuant to the Act and the call.

The opinion then proceeded to consider a tenuous argument of the Government

that, although these soldiers had been called into the service of our armed forces and had come in, in response to the call, they still were not in our armed forces, because, forsooth, Congress had in 1916 written a definition of "The Army of the United States" which did not include them. The argument never was of any validity and should have been ignored or answered with a sentence. But the opinion gave it undeserved attention and pointed out that, under a 1918 statute, the Philippine soldiers were called or could be drafted into our Army in the same way that our National Guard could be called or drafted. That discussion did show, quite unnecessarily, that a definition of our Army written in 1916 did not prevent Congress, in 1918, from putting into the Army persons not covered by its 1916 definition. If it could disregard its 1916 definition in 1918, it could disregard it in 1934. Hence if we assume, without deciding, that the 1918 statute had been repealed, or had fallen into disuse before 1934, the correctness of our former decision is not affected in the slightest degree.

Turning to the statutes and orders which were unquestionably in effect, we remember that Section 2(a) (12) of the Philippine Independence Act authorized the United States, upon order of the President, to call into the service of our armed forces all military forces organized by the Philippine Government. The Constitution of the Commonwealth of the Philippines and the Ordinance appended thereto included the same provision. The President, on July 26, 1941, issued his order, expressly referring to Section 2(a) (12) and the Constitution of the Philippines, saying:

"I hereby call and order into the service of the armed forces of the United States for the period of the existing emergency, and placed under the command of a General Officer, United States Army, * * * all of the organized military forces of the Government of the Commonwealth of the Philippines: * * *

"This order shall take effect with relation to all units and personnel of the organized military forces of the Government of the Commonwealth of the Philippines, * * * from and after the dates and hours, respectively, indicated in orders to be issued from time to time by the General Officer, United States Army, designated by the Secretary of War."

General MacArthur was designated as the General Officer referred to in the Presidential Order. On December 18, 1941, he issued General Orders No. 46 calling all personnel of the Philippine Army on active duty and all active units of the Philippine Army "into the service of the armed forces of the United States in the Philippines," and directing the officers of our army to accept them for such service. As we know, they came and fought, and were defeated, and surrendered just as the rest of our soldiers did. To say that they were not members of our armed forces seems to me to be impossible. I do not see how the law or the facts could be plainer.

On May 7, 1942, General Wainwright ordered the surrender of all American and Philippine Army troops in the Philippine Islands. The language used by the General is, of course, of no importance. He was responding to the demand of the Japanese commander that the order of surrender be made so plain and inclusive that it could not possibly be misunderstood by any soldier.

Sometime later in May an underground unit known as "Hunters ROTC Guerrillas of Luzon" was organized, consisting of 193 men and officers. By the middle of 1945, the number had increased to several thousand.

On October 28, 1944, the President of the Philippines issued an Executive Order providing that all persons actively serving in recognized military forces in the Philippines were to be considered on active service in the Philippine Army, the date of entry into such active service

being the date of joining a recognized military force; that a recognized military force was deemed to be a force under a commander appointed, designated or recognized by the Commander-in-Chief, Southwest Pacific Area.

On March 26, 1945, an order was issued by our Army providing for the recognition of certain guerrilla units as authorized elements of our Army, and saying that the status of members of these units was that of officers and men in the Philippine Army. That was, of course, the Army's way of saying that they were included in General MacArthur's order of December 18, 1941, calling all personnel of the Philippine Army into the armed forces of the United States.

With all of our organized troops being prisoners of the Japanese, and General MacArthur being in Australia, the paper work of the Army was, naturally, incomplete. But, in the opinion of General MacArthur when he was able to return to the Philippines, useful soldiering had been taking place in the meantime, of which we had had the benefit. He therefore issued the retroactive recognition orders dating them back to the times when the various guerrilla units began to fight. The President of the Philippines, who had also been away from the islands, made them members of the Philippine Army as of the date when they began to serve under a commander, recognized by General MacArthur. General MacArthur, after he returned and investigated, recognized them retroactively and thus brought them under the terms of his 1942 order. The paper work of the Army was again up to date.

In 1942 the Attorney General of the United States, 40 Op.Atty.Gen. 185, advised that personnel of the organized military forces of the Philippines, called into our armed forces pursuant to Section 2(a) (12) and the President's Military Order were in active service in the land and naval forces of the United States and were entitled to benefits under the National Service Life Insurance Act. In 1943 he gave similar advice as to benefits under the Missing Persons Act. In the Act of February 18, 1946, 60 Stat. 14, Congress said:

"* * * service in the organized military forces of the Government of the Commonwealth of the Philippines, *while such forces were in the service of the armed forces of the United States* pursuant to the military order of the President of the United States dated July 26, 1941, shall not be deemed to be or to have been service in the military or naval forces of the United States * * * for the purposes of any law of the United States conferring rights, privileges, or benefits upon any person by reason of * * * (such service) * * * except benefits under (1) (the National Service Life Insurance Act) and (2) laws providing for the payment of pensions on account of service-connected disability or death)." (Italics added.)

By the Act of July 25, 1947, 61 Stat. 455, the benefits of the Missing Persons Act were added to those which Philippine personnel should receive, the House Committee saying that they had been omitted from the 1946 Act by inadvertence.

This legislation shows a clear recognition by Congress that Philippine Army personnel were members of our armed forces. The idea of paying National Service Life Insurance, pensions, and benefits under the Missing Persons Act to soldiers or the widows of soldiers of our allies is absurd. Congress denied the other benefits such as payments for college education, loans for the purchase of homes or for going into business, etc., because it was not willing to extend those unusual benefits to these residents of a foreign country. Its saying that, for the purposes of the laws conferring these benefits, the service of these soldiers should not be *deemed* to have been

service in the military forces of the United States was just a short-hand way of saying that they should not get the benefits. It says nothing, and was intended to say nothing, as to whether, in fact and in law, they were in the armed forces of the United States.

If these persons were not, legally and in the contemplation of Congress, in the armed forces of the United States, Congress wrote its law backward. Instead of saying that they *should not*, for the purposes of the laws conferring benefits which Congress did not wish to give them, *be deemed* to be in the armed forces of the United States, Congress would have said that they *should*, for the purposes of the laws conferring the benefits which Congress wished to give them, be deemed to be in the armed forces of the United States.

If it is contended that the Philippine soldiers who were surrendered after some four months of fighting were in our armed forces, but that the guerrillas who took to the hills and harassed our enemy for three years were not, I can only say that I see nothing beyond the powers of General MacArthur in his recognizing, retroactively, the facts as they actually were during his absence. The Government has paid out large sums of money as pay to the guerrillas upon the basis of the General's retroactive recognition. I find no legal flaw in it, and none has been pointed out to us.

If it be contended that the commander of a guerrilla unit in the Philippines, his commander-in-chief being in Australia and all the intermediate commanders being prisoners of war, did not have the authority of the Government to requisition food for his troops, I think the contention is wrong. The alternative might well have been to disband the troops and terminate the resistance. Our Government, when it learned of the resistance, applauded it. I think it is morally and legally bound to pay for what was done for its benefit.

I have discussed the Victorio case in detail because the opinion in this case overrules it. The discussion of the 1918 statute in the Victorio case is a strawman, set up in the instant opinion and, presumably, knocked down, but, assuming that it is vulnerable, it is irrelevant, and knocking down that part of the Victorio opinion is no reason for overruling the decision.