Earl R. and Montez MIDGETT

v.

The UNITED STATES.

No. 495–77.

United States Court of Claims.

July 18, 1979.

Lawrence S. Smith, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant. Bernard M. Brodsky and Levator Norsworthy, Jr., Washington, D. C., of counsel.

Before NICHOLS, KASHIWA and SMITH, Judges.

ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' CROSS–MOTION FOR SUMMARY JUDGMENT

SMITH, Judge:

This military benefits case, before us on the parties' motions for summary judgment, presents a novel and difficult issue of the preclusive effect of a state court *in rem* judgment on the administrative determinations of the United States Army. It might well be subtitled, "The Battle of the Presumptions." Inasmuch as the parties have provided the court with very little guidance, the resolution of this factually uncomplicated case has not been easy. We have carefully considered the filings and oral arguments of the parties, and we have conducted our own independent research in reaching our conclusion. In this long battle between the Army and the Midgetts, the decision must go to the Midgetts.

Plaintiffs are the parents of Pvt. (E2) Dewey Alan Midgett (Midgett). Private Midgett disappeared on Sunday, November 25, 1967, while serving in Vietnam with the United States Army, in the vicinity of Tuy Hoa Phu Hiep. He had been given a pass for the day with instructions to return to the company area by 5 p. m. that afternoon. On his failure to return, the unit commander conducted an "AWOL inquiry," pursuant to Army Regulation (AR) 630–10 (May 1966), which prescribes the procedures for the administration of military personnel who are absent without leave.

Charles M. Munnecke, Washington, D. C., attorney of record, for plaintiffs. Charles E. Poston, Norfolk, Va., and King & Everhard, Washington, D. C., of counsel.

An investigative report by Midgett's commanding officer,[1] filed on December 27,

---

1. Maj. Donald R. Drumm, who commanded Midgett's unit, the 335th Assault Helicopter Company.

1967, set forth the information "compiled related to the probable causes or motives for the absence." In essence this report stated that Private Midgett did not return at the time ordered, that there was no evidence of intent to disappear beyond a statement by an acquaintance that Midgett said he "had the feeling he wanted to bug out for awhile," and that no other information about Private Midgett's disappearance was available.

Private Midgett was dropped from the rolls as a deserter on December 30, 1967, because of his failure to return to military control upon the expiration of 29 consecutive days after having first been listed as absent without leave (AWOL). This was in accord with AR 630-10 ¶ 29e (May 1966), noted in the "Morning Report" of that date.

On August 11, 1975, plaintiffs obtained from the Circuit Court of the City of Chesapeake, Virginia, a decree (Chancery No. 15144) that Midgett be presumed dead *as of* November 25, 1967; that his parents be declared the sole heirs at law, and that his father, Earl R. Midgett, be granted letters of administration. The decree was based on the fact that "said Dewey A. Midgett, then a member of the United States Army, disappeared on November 25, 1967, in the Tuy Hoa area of the Republic of Vietnam, *which country was in a state of hostilities at the time,* and has not been heard of since" (emphasis added). Armed with the Virginia decree, plaintiffs, following years of efforts to locate their son and to clear his name, applied to the Army Board for Correction of Military Records (ABCMR) on August 21, 1975, requesting "the following correction of error or injustice":

(1) Delete from the records:

 (a) DA Form (335th Aviation Company) for November 25, 1967, the words "Dept AWOL 1700 hours 25 November 1967".

 (b) Discharged from the rolls of this organization as a deserter.[2]

(2) Correct the records to show: "Died November 25, 1967".

2. Private Midgett was not "discharged" from the service; he is still carried on the rolls of the United States Army and his records are still

The ABCMR denied the application and Midgett's parents appeal from this decision, contending that the decision was arbitrary and contrary to law, and an abuse of administrative discretion in that it ignored the decree of death from the Commonwealth of Virginia, and that it was not based on substantial evidence. They sue to recover the death gratuity claimed owing, under 10 U.S.C. §§ 1475-80 (1976), as well as for final settlement of accounts of a deceased member of the armed forces, under 10 U.S.C. § 2771 (1976).

I.

■ Because they are seeking a money judgment, plaintiffs are not barred from litigating the incidental, though necessary, question of Private Midgett's status, and their action is not one for declaratory judgment alone, which we are without jurisdiction to hear. *United States v. King,* 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969), *rev'g* 390 F.2d 894, 182 Ct.Cl. 631 (1968). This case is easily distinguishable from *King:* there, the money claim (for back taxes) was otherwise barred by the statute of limitations (jurisdictional in this court), and so the requested determination of disability status was not incidental to any money claim within this court's jurisdiction. Defendant contends that since 37 U.S.C. § 503(a) (1976) provides that those members of the armed forces who absent themselves without authority forfeit all pay and allowances for the period of that absence, any payment to his parents, while Midgett remains in deserter status, would be contrary to statute, citing *Borys v. United States,* 201 Ct.Cl. 597, 607, *cert. denied* 414 U.S. 1001, 94 S.Ct. 355, 38 L.Ed.2d 237 (1973). This argument begs the question before us: we are here called upon to determine whether the ABCMR's decision *not* to change Private Midgett's records was arbitrary and capricious, contrary to law, and unsupported by substantial evidence. If

maintained by the Commander, USAEREC (U. S. Army Enlistment Records Evaluation Center). See AR 630-10 ¶ 101 (1966).

so—if statute or regulation or the Constitution required the board to make the requested changes—then 37 U.S.C. § 503(a) (1976) does not apply, and plaintiffs are automatically entitled to payments under the death gratuity statute and the statute requiring final settlement of accounts of deceased members of the armed forces.[3]

## II.

Plaintiffs also are not barred by the statute of limitations. Defendant analogized the present situation to the cases of *Kirby v. United States*, 201 Ct.Cl. 527 (1973), *cert. denied*, 417 U.S. 919, 94 S.Ct. 2626, 41 L.Ed.2d 224 (1974), and *Mathis v. United States*, 391 F.2d 938, 183 Ct.Cl. 145 (1968), *aff'd on rehearing*, 421 F.2d 703, 190 Ct.Cl. 925 (1970), which held that the cause of action in illegal discharge cases "accrued all at once upon the plaintiff's removal." 391 F.2d at 939, 183 Ct.Cl. at 147. Therefore, the argument goes, the Midgetts' claim first accrued in November 1967, when "the pivotal determination of AWOL status was made" by the Army, and this court's statute of limitations, which is jurisdictional, would bar an action after November 1973.

We disagree. The statute of limitations does not begin to toll until "all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." *Oceanic Steamship Co. v. United States*, 165 Ct.Cl. 217, 225 (1964). Until they obtained the Virginia decree of death, the parents of Private Midgett had no evidence with which to contest the determination of desertion, under an administrative presumption of continued life, made by the Army pursuant to AR 630–10 ¶ 29e. See *Peak v. United States*, 353 U.S. 43, 77 S.Ct. 613, 1 L.Ed.2d 631 (1957), where the Supreme Court dealt with a litigant attempting to recover proceeds of a National Service Life Insurance policy, whose proof of death was the statutory presumption of death codified in 38 U.S.C. § 810.[4] The Court noted that:

Where proof of the insured's death must rest primarily upon his unexplained absence [of the insured], suit may not be maintained, as a practical matter, prior to the expiration of the statutory seven-year period. Petitioner's cause of action, therefore, "accrued" at the time when, under § 810, she might have successfully maintained her suit, and that is the date

---

**3.** In *Sanders v. United States*, 594 F.2d 804, 810–11 n. 11, 219 Ct.Cl. ——, —— (1979), Judge Bennett discussed the role of correction boards in pay cases. He cited 10 U.S.C. § 1552(c), which states that:

"(c) The department concerned may pay, from applicable current appropriations, a claim for the loss of pay, allowances, compensation, emoluments, or other pecuniary benefits, or for the repayment of a fine or forfeiture, if, as a result of correcting a record under this section the amount is found to be due the claimant on account of his or another's service in the Army, Navy, Air Force, Marine Corps, or Coast Guard, as the case may be. * * * *"

He then noted:

"The Senate report on the bill, adding the payment provision to 10 U.S.C. § 1552, stated:

" 'The purpose of the proposed legislation, as amended, is to authorize the Secretaries * * * to make certain payments which become due as a result of action taken by the respective Boards for the Correction of Records * * *.' [S.Rep. No. 923, 82d Cong., 1st Sess., *reprinted in* [1951] 2 U.S.Code Cong. & Ad.Serv. 2469.]

"Payment of money damages was thus clearly contemplated as stemming from corrections."

**4.** 38 U.S.C. § 810 (now 38 U.S.C. § 108) provided:

"No State law providing for presumption of death shall be applicable to claims for National Service Life Insurance. If evidence satisfactory to the Administrator is produced establishing the fact of the continued and unexplained absence of any individual from his home and family for a period of seven years, during which period no evidence of his existence has been received, the death of such individual as of the date of the expiration of such period may, for the purposes of this subchapter, be considered as sufficiently proved."

Section 108 of 38 U.S.C. was made more encompassing than its predecessor. Its first sentence provided:

"(a) No State law providing for presumption of death shall be applicable to claims for benefits under laws administered by the Veterans' Administration." The rest of the statute performs a function similar to that of section 810.

from which the six-year statute of limitations should be computed.

353 U.S. at 45, 77 S.Ct. at 614. The Court went on to note that the presumption of death left open for proof the precise time of death; however, "[t]o compute the six-year limitation period from the date which the trier of fact establishes as the date of death would be to say that the beneficiary's right to recover had expired before she could have successfully prosecuted a lawsuit to enforce that right." *Id.* at 46, 77 S.Ct. at 615. This court also recognized the procedural hazards that the statute of limitations may pose to plaintiffs whose proof of death is an unexplained absence for a specified period of time. *Acosta v. United States,* 320 F.2d 382, 386, 162 Ct.Cl. 631, 637 (1963) (a case involving a claim for retirement pay). For reasons discussed below, we do not think that this case requires application of the presumption of death at the end of the 7-year period of absence, as was done in *Acosta,*[5] but we do rely on that decision and the Supreme Court's discussion in *Peak, supra,* for the proposition that plaintiffs' cause of action did not accrue until they had in their possession the decree which stated that Private Midgett had died.

### III.

■ Defendant also argues that our scope of review precludes consideration of the deserter determination made in the first instance, citing *Logronio v. United States,* 133 F.Supp. 395, 132 Ct.Cl. 596 (1955), for the proposition that this court is without jurisdiction to alter prior determinations of the status of military personnel. While *Logronio* involved a status determination under the Missing Persons Act, more recent authority construing that same statute has "dismiss[ed] out of hand defendant's suggestion that the determinations were expressly intended, and consistently held by this court, to be nonreviewable and conclusive." *Crone v. United States,* 538 F.2d 875, 877, 210 Ct.Cl. 499, 521 (1976). The same holds true for military determinations under the regulations governing AWOL and

deserter status. Just this term, we have reaffirmed the boundaries of our scope of review of military correction boards' decisions:

> Once a plaintiff has sought relief from the Correction Board, such plaintiff is bound by that board's determination unless he can meet the difficult standard of proof that the Correction Board's decision was illegal because it was arbitrary, or capricious, or in bad faith, or unsupported by substantial evidence, or contrary to law, regulation, or mandatory published procedure of a substantive nature by which plaintiff has been seriously prejudiced, and money is due. *See, e. g., Skinner v. United States,* [594 F.2d 824, 219 Ct.Cl. —— (1979)]; *Boyd v. United States,* 207 Ct.Cl. 1 (1975), *cert. denied,* 424 U.S. 911 [, 96 S.Ct. 1106, 47 L.Ed.2d 314] (1976); *Cooper v. United States,* 203 Ct.Cl. 300, 304 (1973).

*Sanders v. United States,* 594 F.2d at 811, 219 Ct.Cl. at ——. Plaintiffs are entitled to an examination of the validity of the subject determination under the standard of review articulated in the cases just cited. We must therefore examine the basis of the board's decision and decide for ourselves whether it was supported by substantial evidence.

In doing so, we must carefully review the evidence before the ABCMR, and this review warrants a consideration of the effect of the Virginia decree of death, and the degree of deference which the board must give it.

The ABCMR had before it the following evidence:

(1) The investigation report, which was filed on December 27, 1967, and which is set forth in full in Appendix A.

(2) The Virginia decree of death, which stated that Private Midgett was presumed to be dead as of November 25, 1967.

(3) In addition to the investigation report and Virginia decree, *ante,* the board had

---

**5.** Note that in *Acosta,* the California state court decree of death did not expressly indicate when the death occurred. 320 F.2d at 383, 162 Ct.Cl. at 632.

before it Private Midgett's service file, which showed he was born December 29, 1947; enlisted for 3 years on March 18, 1965; was honorably discharged on September 6, 1966, for the purpose of reenlisting; reenlisted on September 7, 1966, for 3 years; received the Purple Heart with OLC, the Bronze Star Medal for valor, the Air Medal for valor, and the Bronze Star Medal for service; had Vietnam service from January 1966; and that Sp4c was the highest grade held.

(4) The board also relied on an advisory opinion of the Judge Advocate General, which stated in part that the decree of the Virginia court "is not binding on the Department of the Army. However, that determination may be considered by the Army as a relevant fact bearing upon the questions of whether, when, and as of what date Private Midgett could be declared dead for the purposes of Army administration." The opinion also offered its own view of the evidence: "[T]he administrative determination of AWOL and subsequent determination of desertion appear warranted."

(5) Although nowhere contained in the investigation report, there appears in the board's discussion a statement that Midgett "was last seen by members of his unit going toward a Vietnamese village." This is apparently based on a letter, sent in response to plaintiffs' attorney's August 14, 1975, inquiry to members of Midgett's company, from one Herbert Givens, Platoon Sergeant, in which he states, "An investigation revealed that [Midgett] left the beach and was last seen going into a village near by." The letter is dated September 22, 1975, almost 8 years after the disappearance.

(6) Finally, the record contained a covering memorandum from Col. Robert R. Serra, Commanding Officer of the United States Army Enlistment Records Evaluation Center, dated August 5, 1976, returning to the ABCMR plaintiffs' application for correction of records, stating that:

1. The inclosed application pertaining to Private Dewey A. Midgett, 225 68 8969, is returned as administrative relief cannot be granted by this headquarters.

2. The determination that Private Midgett was absent without leave on 25 November 1967 was based upon a thorough investigation and the resulting evidence available to the unit commander. There was no evidence that he was missing in action, captured, or a victim of foul play, and no such evidence has since been found.

3. The records show that the authorities in Vietnam checked many possible sources of information, including medical facilities, graves registration activities, mortuaries, criminal investigation and military police units, with negative results.

4. The Department of the Army will issue a report of death, *in the case of a service-member who is carried as a deserter, only upon receipt of conclusive evidence of death.* The fact that the civilian courts have declared Private Midgett to be presumed dead is not binding on the Department of the Army. [Emphasis added.]

The board denominated the foregoing "Material Evidence of Record," determined that "[t]he applicant has failed to submit sufficient relevant evidence to demonstrate the existence of probable material error or injustice to warrant a formal hearing," and denied the application. The board's discussion of the material evidence of record is couched in negative terms: the evidence "*does not show* [Midgett's] failure to return to his unit as directed was due to some outside force or circumstances beyond his control"; "the overriding factor for consideration appears to be the fact [Midgett] *failed to return to his unit as directed*"; and "numerous efforts made by the authorities to check all possible sources of information concerning [Midgett's] status with negative results." (Emphasis added.)

The most telling statement, however, appears in the board's "Discussion" section: "[T]he Command, after a complete and detailed investigation *had no alternative but to carry him as AWOL* for a period of over 30 days and then show him as being dropped from the rolls in desertion." (Em-

phasis added.) It is in this crucial, initial determination of AWOL that all the difficulty began. As far as we can tell, this determination is discretionary with the unit commander. Once it has been made, however, status consequences flow inexorably. If a member is classified as AWOL the status determination of desertion requires nothing more than a finding of absence without leave for 29 consecutive days; it is one of the nine sets of circumstances under which an absentee could be dropped from the rolls as a deserter. See AR 630–10 ¶ 29 a–i.[6] Some of these circumstances refer directly or indirectly to *intent* to desert; others are merely an administrative convenience. Paragraph 29e, the one with which we are concerned, makes no reference to intent. ["*Upon expiration of 29 consecutive days of unauthorized absence unless required elsewhere in this regulation to be dropped sooner.*" (Emphasis added.)] That initial determination of unauthorized absence can be changed to authorized absence or to unavoidable absence which may be excused, but the regulation requires presence of the formerly absent member to conduct the investigation,[7] the implication, reading the negative pregnant, being that if the member does not return, there is no authority to reclassify an absence.

It would be too easy in this case to be swayed by sympathy for Private Midgett's family, which the record shows to be one with an honorable military tradition. It would be easy to be swayed by a comparison of the relative equities of those cases of expatriates later pardoned or granted amnesty for a total evasion of service, or of former service personnel whose less than honorable discharges have been upgraded (in part due to changing social perceptions) with the determination in this case to burn the brand of "Deserter" upon a two-time

volunteer whose record of courage and valor in battle was exceptional. We resist that temptation, recognizing that we would really be providing simply another example to illustrate the maxim that hard cases make bad law, and imposing upon the military an elusive standard that it could ill afford in times of war.

■ Instead, we must decide whether substantial evidence supported the ABCMR's determination that Private Midgett's parents failed to submit sufficient relevant evidence to demonstrate "the existence of probable material error or injustice." We are constrained to observe that whatever little evidence exists supports a conclusion that Private Midgett did not desert. The passage now of 12 years since his last appearance makes such an observation even more compelling.

The record shows that the initial determination, "absent without leave," was based on nothing more than administrative convenience and a hearsay statement, uncorroborated and of questionable probative value, that Midgett had said he "had the feeling he wanted to bug out for awhile." Whatever that statement can be interpreted to mean, the very language in itself describes a limited, and not a permanent departure, i. e., "for awhile." No doubt it was a sentiment harbored on at least one occasion by every officer and every enlisted person who ever had to fight a war. No doubt hundreds of soldiers in Vietnam did "bug out" *for awhile.* No doubt some of them "bugged out" permanently, or deserted, but their convictions for desertion would certainly have to depend on something more substantial than hearsay repetition of such a statement as that attributed to Midgett.

---

6. A tenth additional set of circumstances was included in the changes to these regulations, promulgated April 17, 1969:

"*j.* Upon reasonable belief that the absentee intends to remain away permanently from his unit, organization, or place of duty; or the absentee quit his unit, organization, or place of duty with intent to avoid hazardous duty or to shirk important service."

This option would appear to revive some recognition of the useful purpose served by an earlier but discontinued charge of "Absent Over Leave," a lesser offense than AWOL.

7. AR 630–10 ¶ 70a (1966). As changed in 1969, the regulation allows an informal investigation immediately upon a member's return. AR 630–10 ¶ 70a (as changed Sept. 16, 1969).

The letter from Platoon Sergeant Givens was not used in the initial determination of desertion and could not have been, although it was before the ABCMR. It merely stated that "[a]n investigation revealed that [Midgett] left the beach and was last seen going into a village near by." Its value as evidence is also extremely questionable, as it is merely a statement, made 8 years after the event, about the recollected *results of an investigation*, and does not even purport to be a recollection by Givens of his own previous and personal knowledge. The AWOL inquiry of December 27, 1967, clearly states that it was not confirmed that Private Midgett was even in the vicinity of the beach. Nowhere does that report state that Midgett was last seen going into a village nearby the beach. There was no evidence in the record that the liberty party was restricted to the beach. The record does not establish that Midgett was at the beach, much less support a finding that he "left the beach" or that he was "seen going into a village near by." These are merely 8-year old recollections of Platoon Sergeant Givens of the *results* of an investigation, recollections which are not supported by the official report of the investigation itself. In any event, the fact that a soldier who had been authorized leave was seen walking to a village, if a fact, is not, standing alone, an indication of his intent to desert. The ABCMR committed serious error in stating in its determination this remark of Givens as a fact, which, as shown, was nothing more than an inaccurate recollection.

If Givens' and Gooden's statements (the *only* "evidence" the board could have relied on to reach the decision it reached) rise to the level of competent evidence that desertion was the probable cause or motive for Private Midgett's absence, then such flimsy evidence is in any event overwhelmed by evidence of at least an equal or better level

of competence, which *was* presented to the board.

The AWOL inquiry of December 27, 1967, stated in its first item of information that the only conclusion that could be drawn from the contents of letters from Midgett's mother, found in his personal belongings, was that he was not writing to his mother on a regular basis. On the other hand, the board had before it copies of letters written by Midgett to his mother which contain affirmative evidence of lack of any intent on the part of Midgett to desert. In a letter dated October 26, 1967, Midgett wrote to his mother:

I have two years left in the Army. I am going to spend that two years overseas. I don't want to come home until I get out of the Army.

In his last letter to his mother, undated but shown to have been received on December 2, 1967, he stated:

Well It's good to hear that Holton Jr. is home. I was going up to see him I am right below Quin Noin. So, he he [sic] likes the Army. I like it too, so much I would revoke my citizenship if they ever try to call me back.

I also received a letter from Oscar he said he would be in Nam a complete tour. I hope we get a chance to get together.

\* \* \* \* \* \*

Oh. Mom. I lost my drivers license see if you can get me another copy[.] I need them to get an international license.

In addition to this correspondence there is in the record a letter from Midgett to a friend, dated September 24, 1967, which is probably typical of letters from young soldiers to young girls. It merely narrates his troubles and his accomplishments without any indication of a desire to escape his situation.[8]

---

8. *E. g.:*

"\* \* \* I did extend again. Yesterday was 21 months in Viet Nam. I could have come home this summer on another 30 day leave but decided to stay and save my money. I am going to extend my tour another 6 mos. and I won't be taking a leave then eather [sic] so I won't be home until July 68.

"By then I'll be able to buy a car or a bike. I haven't made up my mind on which one I want.

"I have had a lot happen to me in the past months since I came back over here off leave.

"I had a little trouble and got busted (notice P.F.C. on address). I have be [sic] decorated four times encluding [sic] another Purple Heart. I was wounded again June when a

This correspondence, in the record before the ABCMR, was evidence not available to Midgett's unit commander. It is not only substantial, but would support a finding by the board that an error or an injustice had been committed in listing Private Midgett as a deserter, or in finding that he had any intent to desert. It in no way supports an opposite inference, and, there being no direct evidence of desertion *vel non*, inferences are all that are available to reach a conclusion on the question of desertion.

As to Givens' letter, it was only one of many gathered by plaintiff's attorney by meticulous efforts to contact every member of Private Midgett's company. One letter from a Sergeant Kinsinger stated that "Pvt. Midgett had been some thing of a disciplinary problem in the 335th and we were not unduly alarmed at his failure to return from his 'leave' as he had absented himself before." The inference here is that Midgett would be expected to return, not desert, even if he were over leave. With the exception of Kinsinger's letter and the inaccurate recollection stated by Givens, none of the correspondence, including a letter from the author of the AWOL inquiry, [now] Lieutenant Colonel Drumm, recalled any details of the incident.

The AWOL inquiry stated explicitly that—

> e. There is no record or evidence not to return, to miss movement through neglect or design, to avoid hazardous duty, or shirk important service except * * [the statement attributed to Gooden that Midgett "had the feeling he wanted to bug out for awhile."].

The AWOL inquiry stated that there was no record of pertinent evidence found among the absentee's personal effects except the letter to "Oscar," and its contents. The board had before *it* evidence that the said "Oscar" was Private Midgett's uncle, who was stationed at Vung Tau, and who came to visit Private Midgett 3 days after the disappearance. The record indicates that Midgett's Uncle Oscar made intensive but futile efforts to obtain information as to the disappearance or Private Midgett's possible whereabouts.

All of the above-recited information before the ABCMR appears to the court to be substantial evidence upon which the board could have based a finding of "probable material error or injustice." Be that as it may, the record before the board is shown to have contained *no* evidence to support the findings of the unit commander, or its affirmance by the board, that Private Midgett was a deserter.

The evidence developed by Private Midgett's family and their counsel subsequent to 1967, none of which is consistent with a finding of desertion, must be considered against the background of Private Midgett's military record otherwise. He voluntarily enlisted for 3 years on March 18, 1965, less than 3 months past his 17th birthday. By the following January, he was in Vietnam. For a period beginning January 1, 1966, through December 13 of that year he was awarded the Bronze Star Medal. On April 2 of that year he was wounded in action for which he was awarded the Purple Heart. For his heroic action during a period beginning June 28, 1966, and while serving as a member of Company B, 1st Battalion, 5th Infantry, Midgett was awarded the Bronze Star Medal for finding, searching, and destroying Viet Cong tunnel complexes. "Always faced with the possibilities of booby traps and cave-ins as well as the Viet Cong, he consistently volunteered to enter and search all tunnels." On September 6, 1966, with only a year and a half of his enlistment remaining, Midgett voluntarily obtained a discharge in order to reenlist the next day for an additional 3 years. He was awarded the Air Medal twice for active participation in more than 50 aerial missions over hostile territory and particularly for action on June 7, 1967 [after he had

---

bullet came through the floor of my helicopter and hit an ammo box between my legs. All I got was fragments in my left hand and arm.

 \* \* \* \* \* \*

" \* \* \* Say hi to everyone for me. <u>Write soon.</u>

 "[/s/] Alan"

been "busted" to Private E2.][9] As a Private E2, Midgett was also awarded the Purple Heart on July 1, 1967. At the time of this last recited incident, Private Midgett, then the recipient of six awards, was 19 years old. His 6-foot 3-inch frame and his achievements made Private Midgett a big man in more than one sense, belying any image which might otherwise be created by his surname. Those achievements, together with his statements and actions of record, indicate an overall satisfaction with his role as a soldier. There is no evidence whatsoever in the record to support the routine declaration of this man, on the day following his 20th birthday, to be a deserter. The evidence is all the other way.

■ In circumstances where a determination of status is required, and *no* evidence available would justify one choice or another, an administrative presumption of a particular status based on a policy rationale (uniformity, desire to discourage deserters) might be justified. Thus, the ABCMR's determination of Midgett's status might be justified if there was *no* evidence to the contrary. But here there is evidence to the contrary—both the Virginia decree of death and the circumstances surrounding Private Midgett's disappearance.

The effect of the Virginia decree of death is therefore important to our review of the ABCMR's determination. The arguments made by both sides are conclusory. Defendant states: "The Virginia civil court decree relied upon by plaintiffs is not determinative of the son's status vis-a-vis the Army." Plaintiffs insist, without elaboration, that the federal courts must recognize, under the full faith and credit statute, 28 U.S.C. § 1738, the Virginia death decree.

■ Section 1738 of 28 U.S.C. imposes on a federal court presented with a state court judgment the same force and conclusive effect as it has in the state in which it is rendered. 50 C.J.S. *Judgments* § 900a (1947), at 519. Administrative bodies of the United States as well as courts are required to adhere to this requirement. *Torres v. Gardner*, 270 F.Supp. 1 (D.P.R.1967). Of course, this rule is limited by the Supremacy Clause. A judgment or decree of a state court whose effect would restrain the exercise of sovereign power of the United States by imposing requirements that are contrary to important and established federal policy would not be given effect in a federal court. *See Byrd v. Blue Ridge Cooperative*, 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1957) (state rule yields to federal policy favoring jury decisions of disputed fact questions in workmen's compensation cases); *Red Fox v. Red Fox*, 564 F.2d 361, 365 n. 3 (9th Cir. 1977) (federal policy of providing special status and protection to the Indians); *American Mannex Co. v. Rozands*, 462 F.2d 688, 690 (5th Cir.), *cert. denied*, 409 U.S. 1040, 93 S.Ct. 524, 34 L.Ed.2d 489 (1972).

We will discuss both the effect the decree would have in the Commonwealth of Virginia and, finally, whether use of the decree in an administrative body like the ABCMR would encroach enough on an important

9. The "Reason" for the Air Medal award reads as follows:

"For heroism while engaged in aerial flight in connection with military operations against a hostile force: Private Midgett distinguished himself by heroic actions while flying as gunner in the low ship of a fire fly team of armed helicopters supporting the 25th Infantry Division (ARVN) at Duc Hoa, Republic of Vietnam. As the [f]light flew down a small canal, three camouflaged sampans were spotted. As his aircraft moved in to destroy the sampan, Private Midgett opened fire. Suddenly there was a large secondary explosion that threw debris high into the air. Private Midgett was struck by debris but instantly spotted a Viet Cong machine gun when it opened fire on his aircraft. Without hesitation he returned fire. During the course of the melee when the helicopter was receiving fire from the enemy he unhesitantly leaned far out of the aircraft in order to deliver heavy volumes of devastating fire into as many of the gun positions as possible. The fire fight lasted 45 minutes in which he was constantly exposed to heavy automatic weapons fire. The results of the conflict were 27 Viet Cong killed, 8 sampans sunk and an unknown amount of ammunition destroyed. Private Midgett's outstanding courage and devotion to duty are in keeping with the highest traditions of the military service and reflect great credit upon himself, his unit and the United States Army."

federal policy to warrant the ABCMR's ignoring the judicial decree.

Normally, against strangers to a proceeding a judgment is not even evidence to prove facts involved in the judgment. However, in proceedings *in rem*, although orders and decrees of a court do not have conclusive binding force upon all the world, they are prima facie evidence of the findings made therein. 8B Michie's Jurisprudence of Virginia & West Virginia, *Former Adjudication or Res Judicata* §§ 16, 68 (1977). *See Holly River Coal Co. v. Howell*, 36 W.Va. 489, 15 S.E. 214 (1892).

The presumption of death, based on proof of absence of 7 years without having been heard from, is a legal presumption, as opposed to an administrative presumption of fact. As such, the presumption amounts to a prima facie case for the party bearing the burden of proof; where there is proof in rebuttal, the presumption as such disappears, and the question is one of fact; one of the facts is the inference of death based on 7 years' absence. Thus, with proof of 7 years' absence alone, if defendant is content to submit the case without any rebuttal evidence, a verdict for plaintiff on the issue of death is required. 5B Michie's Jurisprudence, *Death* § 2 (1976).

There is, however, no presumption as to the *time* of death; the burden of proving that death took place at any particular time within the 7 years lies upon the person claiming a right to the establishment of which that fact is essential. *Evans v. Stewart*, 81 Va. 724 (1886). Yet the presumption of continued life, not being a true legal presumption, yields in this case to the *fact* on which the circuit court based its decree, that "said Dewey A. Midgett, then a member of the United States Army, disappeared on November 25, 1967, in the Tuy Hoa area of the Republic of Vietnam, *which country was in a state of hostilities at the time*." *In re Dewey A. Midgett*, Chancery No. 15144 (Va.Cir.Ct., Chesapeake Co., Aug. 11, 1975) (decree). In any case, even without a finding of time of death, the "presumption" of continuance of life gives place

to true presumptions of law; the presumption of death overcomes the inference that the absentee is still alive. 7 Michie's Jurisprudence, *Evidence* §§ 19, 21 (1976).

Plaintiffs can use the Virginia decree in two ways. First, if the decree is granted full faith and credit, the determination of death would be a legal presumption which the Army would have to rebut, and the decree would be treated as prima facie evidence of the findings therein, including the date of death. No rebuttal evidence was proffered by the Army, so the fact of Midgett's death should stand. An administrative presumption of desertion based on 29 consecutive days of absence without leave is not evidence satisfactory to rebut the plaintiffs' case.

The decree of death states that Midgett died "on or about November 25, 1967." The Army presented no facts other than the administrative presumption of continued life to challenge that finding, so the ABCMR's determination of Midgett's continued life is not only based on insubstantial evidence; it is contrary to the only evidence of date of death set forth by plaintiffs.

Second, even if we do not apply the doctrine of full faith and credit, we find that the ABCMR acted erroneously by ignoring the Virginia decree of death. The Office of the Judge Advocate General, while emphasizing that the decree of the Virginia court was not binding on the Army, stated that "that determination [of the Virginia court] may be considered by the Army *as a relevant fact* bearing upon the questions of *whether, when*, and *as of what date* Private Midgett could be declared dead for the purposes of Army administration." (Emphasis added.) Thus, the Army agreed that the decision of the Virginia court, relating to both the fact and time of death, was placed before the board as stating *facts* to be considered even if the decree itself was not to be considered binding. In essence, this is very similar to the use of the decree under a full faith and credit standard, as the decree was an *in rem* judgment which was to be used against strangers. Given that the facts of death

and death on the 25th of November were "facts" before the board, the Army was required to present some evidence rebutting or disproving these facts. It could not do so, and the board relied on presumptions which we cannot find to outweigh the facts and inferences accepted by the Virginia court. The board's error was magnified by the fact that all of the evidence, scant as it was, supported an inference that Private Midgett never exhibited any inclination which would support a finding that he would intentionally and permanently absent himself from military control.

■ Colonel Serra's letter stated that the presumption of death of the civilian courts was not binding on the Army; that the Army will issue a report of death in cases where a serviceman had been classified as a deserter (a classification based on an administrative presumption) only upon receipt of conclusive evidence of death. This places upon Midgett's parents the almost impossible task of proving that Midgett is not alive. *Secretary of HEW v. Meza*, 368 F.2d 389 (9th Cir. 1966), held that a Social Security regulation presuming death after 2 years' unexplained absence cannot be read to preclude any presumption of death after a long period of time in circumstances where an absence cannot be explained, as this would place an impossible burden upon applicants for benefits who lack such an explanation of the missing party's death. Thus, given a long period of unexplained absence (in *Meza, supra,* the period was over 10 years), the Secretary bore the burden of explaining the disappearance in a manner consistent with continued life.

We think that the same considerations apply in this case. Here there is a soldier who disappeared in a country engaged in civil war. During wartime, it is not unusual that persons may be killed, their graves unmarked, and their deaths unrecorded. Indeed, inferences of immediate death may be and have been drawn if persons missing were last seen in a state of imminent peril and are never seen again. *See, e. g., In re Estate of Rausch,* 75 Misc.2d 483, 347 N.Y.S.2d 925 (Sur.Ct.1973) (Vietnam serviceman shot down and not returned with other POW's might be presumed dead as of the date he was shot down). And circumstances other than exposure to some specific peril or immediate danger can still allow an inference of death at the time the departed person was last seen. *In re Estate of Regas,* 79 Misc.2d 170, 359 N.Y.S.2d 857 (Sur.Ct.1974) (court took notice of genocidal slaughter and fire in which a substantial population of Smyrna, Turkey, died in 1922, and assumed that the decedent died in 1922); *see also John v. Burns,* 67 So.2d 765, 767 (Fla.1953), *Hefford v. Metropolitan Life Ins. Co.* 173 Or. 353, 144 P.2d 695 (1944) (in both, a finding of death on the last day the absent men were seen was upheld, as the court found it improbable that the men would have abandoned their homes and families voluntarily).

■ Defendant contends that it need not consider the Virginia determination of death, as military personnel decisions and the administrative procedures governing them are a uniquely federal issue within the realm of military affairs—a variant on the theme that "judges are not given the task of running the Army." *Orloff v. Willoughby,* 345 U.S. 83, 93, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953) (dictum). However, when protected interests are at stake, such as Midgett's parents' interest in the death gratuity, or when plaintiffs have alleged judicially cognizable injuries, consideration of military statutes and the determinations of military judicial boards are not precluded from our judicial review. *Harmon v. Bruckner,* 355 U.S. 579, 78 S.Ct. 433, 2 L.Ed.2d 503 (1955); *Sanders, supra; McDonald v. McLucas,* 371 F.Supp. 831, aff'd, 419 U.S. 987, 95 S.Ct. 297, 42 L.Ed.2d 261 (1974). And this case does not present the type of unique or important federal or military interest which would preclude the ABCMR's consideration of the Virginia decree.

No regulatory or administrative procedures providing for an administrative determination of desertion are being altered by this decision. Given the rules of the Com-

monwealth of Virginia, the effect of the Virginia decree is merely evidentiary. It did not bind the military in this case but created a presumption which they had to rebut. Today's decision merely reaffirms a basic evidentiary rule that a presumption based on administrative convenience can be rebutted by presentation of facts contradicting the presumption, and that the party relying on the presumption must then come forward with facts to win his case. In no way do we alter the rule that absent any other evidence, the Army can rely on an administrative presumption. However, the decision prevents the harsh result that an administrative determination of desertion made in the press of war, itself unsupported by an evidence of desertion or intent to desert, will practically, if not legally, be the final determination of desertion if the party named as a deserter is never found.

By insisting on these basic evidentiary rules, the court is not interfering with important federal policies. We are not contesting the rule of the Veterans' Administration statute, 38 U.S.C. § 108, that the presumption of death arises at the end of the 7-year period, although we note that that statute does not apply in our case. And in these circumstances we find no need to challenge Judge Davis' statement in *Acosta v. United States, supra,* 320 F.2d at 385, 162 Ct.Cl. at 636, that in pay claims against the Federal Government, we presume death at the end of the 7-year period "in the absence or insufficiency of such proof [of time of death]." We note, as he did, that the presumption is not conclusive. In Private Midgett's case, unlike *Acosta,* there is evidence supporting an inference of an earlier death, as well as a decree of death from a state court stating its conclusion as to date of death. The existence of the additional evidence pointing to a time of death makes the presumption of death at the end of 7 years unnecessary and unwarranted.

 This court, without denying the right of the military to manage their own affairs, has reviewed with scrupulous care cases of less than honorable discharges ef-

fected by administrative fiat without court-martial convictions; we have done so because of the stigma thereby inflicted. The military are not permitted to return persons to civil life with an unfair and derogatory characterization of their military service, attached without strict conformity to law, and full due process protection. *Carter v. United States,* 518 F.2d 1199, 207 Ct.Cl. 316 (1975), *cert. denied,* 423 U.S. 1076, 96 S.Ct. 861, 47 L.Ed.2d 86, *rehearing denied,* 424 U.S. 950, 96 S.Ct. 1423, 47 L.Ed.2d 356 (1976); *Conn v. United States,* 376 F.2d 878, 180 Ct.Cl. 120 (1967); *Clackum v. United States,* 296 F.2d 226, 148 Ct.Cl. 404 (1960). The characterization of a serviceman, disappeared and presumably deceased in a combat zone, as a deserter, falls in a similar category of stigma cases, and we believe requires similar strict scrutiny by the court. The case is precisely of the kind the ABCMR was meant by the statute, 10 U.S.C. § 1552, to deal with: to remove stigma from records created hastily in a war zone and without the procedural safeguards to be expected in time of peace. Since the ABCMR did not accord a full due process hearing, we think its conclusions are entitled to small weight here, and the conclusion that it has abused its discretion and made a decision without support of substantial evidence is readily reached.

Major Drumm, in the press of war, disposed of the matter in the most convenient way available to him under the regulations and moved his unit forward. We do not impugn his motives or minimize his need to approach his duties in a manner consistent with the press of more urgent matters at hand. This cannot be said of the ABCMR. Unlike Drumm, the board had the time and it had the evidence and it had as its principal obligation, to the Midgetts as well as to the Army, the duty of carefully examining and considering facts accumulated over a period of almost 10 years, all of which are favorable to plaintiffs.

 While we do not presume to reweigh and reevaluate the evidence and substitute our conclusions for those of the ABCMR, we do find that the ABCMR's

reliance on the administrative presumption of desertion, and the uncorroborated, inconclusive, and secondhand testimony of former comrades of Midgett is legal error, as the board had before it a legal presumption of death at a particular time in the form of a decree of death from a civil court, as well as the fact of Midgett's disappearance at a time and place of wartime hostilities. And even if we do not fight the "battle of the presumptions" and determine that the legal presumption of death has precedence over the administrative presumption of continued life, we find the decision of the ABCMR to be arbitrary and capricious. Its decision to affirm the conclusion of Midgett's unit commander was not supported by substantial evidence; indeed, the evidence before the board was sufficient to warrant the changes requested by the Midgetts.

Accordingly, we deny defendant's motion for summary judgment; we grant plaintiffs' cross-motion for summary judgment; and remand the case to the trial division for determination of the amount of recovery pursuant to Rule 131(c). The Secretary of the Army is directed to correct the records of Private Midgett in the manner plaintiffs have requested.

### APPENDIX A

The AWOL inquiry letter of December 27, 1967, reads as follows:

1. UP of USARV Reg. 630–10, para 5, the following information has been compiled related to the probable causes or motives for the absence.

a. Individual's personal belongings revealed numerous letters from his mother with only one conclusion—that he was not writing to his mother on a regular basis. There was no further evidence of domestic strife or indebtedness.

b. A complete check of all personnel of this organization revealed one individual that could be considered a close friend of PVT Midgett.

(1) GOODEN, Richard T. SP4 E–4 RA 15 926 521. The only information available from SP4 Gooden was a statement he recalls Midgett made prior to being AWOL. This verbal statement from Midgett was that he "had the feeling he wanted to bug out for awhile".

c. The absentee, PVT Midgett, was stationed with this organization at Phu Hiep, Republic of Vietnam. During the period that PVT Midgett disappeared from this location the unit was not involved in combat operations at Phu Hiep, RVN. The individual was given pass privileges on the afternoon of 25 November 1967, with instructions to return to the unit area by 1700 hours, 25 November 1967. The individual did not return to this unit at the specified time, and has not been seen since. There is information (not confirmed) that PVT Midgett was in the vicinity of the beach, coordinates CQ 412381, Phu Hiep, RVN, on the afternoon of 25 November 1967. On 26 November 1967, a report was filed with Military Police and CID at Phu Hiep, RVN. Further a check was made with Graves Registration and the 91st Evacuation Hospital at Phu Hiep. These agencys [sic] had negative information and could not compile any further information concerning the disappearance of this individual.

d. There is no record or evidence of foul pay [sic] or mental instability involved.

e. There is no record or evidence not to return, to miss movement through neglect or design, to avoid hazardous duty, or shirk important service except as indicated in item b.

f. There was no record of pertinent evidence found among the absentee's personal effects, except one letter assumed to be written by PVT Midgett on 15 November 1967, to meet a friend named "Oscar" (No Last Name) in Vung Tau, RVN, on 23 November 1967. However, this letter was not mailed and found in the individual's personal effects. The names of personal correspondents are listed below:

(1) Mrs. E. R. Midgett, 2308 Smith Ave., Chesapeake, Virginia 23519, Mother

(2) Miss Denice Sheppard, 1001 Centerville Rd, Virginia Beach, Virginia 23462, Friend

(3) Gail Andrews, Box 81, Bismark, Illinois 61814, Friend

(4) M. C. (Jamey) Jameson, Jr., 250 Grand Ave, Nogales, Arizona 85621, Friend